**LAUREL SAND & GRAVEL, INC.;
Maryland Midland Railway, Inc.,
Plaintiffs–Appellants,**

v.

**CSX TRANSPORTATION, INC.,
Defendant–Appellee.**

No. 89–1076.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 2, 1990.

Decided Jan. 30, 1991.

As Amended Feb. 12 and Feb. 26, 1991.

Rehearing and Rehearing In Banc
Denied Feb. 27, 1991.

Robert Gene Levy, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., argued for appellants (Berryl A. Speert, Harry J. Katrichis, A. David Demiray, Frank, Bernstein, Conaway & Goldman, Baltimore, Md. and Fritz R. Kahn, Verner, Liipfert, Bernhard, McPherson and Hand, Washington, D.C., on brief), for appellant Laurel Sand & Gravel (Charles M. Chadwick, Chadwick & Whaley, Rockville, Md., on brief), for appellant Maryland Midland Ry.

Richard McMillan, Jr., Cromwell & Moring, Washington, D.C., argued (Kent A. Gardiner, Shawn N. Sullivan, Nancy J. Spencer, Crowell & Moring, Washington, D.C. and Fred R. Birkholz, CSX Transp., Inc., Baltimore, Md., on brief), for appellee.

Before ERVIN, Chief Judge,
RUSSELL, Circuit Judge, and
MICHAEL, United States District Judge
for the Western District of Virginia,
sitting by designation.

ERVIN, Chief Judge:

Laurel Sand and Gravel, Inc. ("LSG") and Maryland Midland Railway, Inc. ("MMR") appeal summary judgment in favor of CSX on alleged violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. This Court must determine whether or not the district court erred: (1) in ruling that there was no probative evidence that the refusal of defendant CSX to grant trackage rights to MMR over its rails was prompted by conspiracy, (2) in holding that LSG lacked standing under § 4 of the Clayton Act, or (3) in dismissing MMR's claim under § 2 that CSX denied it access to an "essential facility" by refusing to sell MMR trackage rights. Finding no error in the district court's decision, we affirm.

## I.

LSG, a manufacturer and distributer of sand and gravel, and MMR, a shortline railroad, sued CSX, a national railroad. In Count I of their two-count complaint, both contended that CSX conspired with Millville Quarry, Inc. ("Millville"), LSG's competitor, to keep LSG out of the Washington, D.C./Baltimore aggregate material (sand, gravel, and crushed stone) market in violation of § 1 of the Sherman Act. In Count II, only MMR alleges that CSX, in violation of § 2, monopolized a second market defined as "rail transportation of aggregates[s]" to the Washington/Baltimore market by refusing to grant MMR access to an essential facility, namely CSX's tracks.

The lower court entered summary judgment in favor of CSX on both counts of the complaint. Moreover, the court dismissed the claims of LSG because it lacked standing. 704 F.Supp. 1309.

## II.

These three decisive issues emerge from the following facts. LSG was incorporated in 1982, and thereafter acquired a site for the production and distribution of its product, sand and gravel, midway between Washington and Baltimore. The site was adjacent to an intersection of railroad lines known as Annapolis Junction. The main line running through the junction ran north-south and was owned by CSX.

In 1982, LSG made known its plan to purchase a quarry in the Washington/Baltimore area to supply that market. LSG informed CSX that it would need to ship material to its Annapolis Junction distribution center via CSX's lines. Four years after its purchase of its distribution center property, LSG acquired Barrick Quarry in Frederick, Maryland, in 1986.

To move stone from Barrick Quarry to the Annapolis Junction distribution center, LSG would have to transport stone via the MMR track running east to west from the quarry to Emory Grove. From Emory Grove it would have to transport from north to south via the CSX rails to Annapolis Junction. In order to actually reach the center once at the junction, LSG needed to use some 1,700 feet of CSX "wye" or spur tracks, which connected LSG's facility to the main rail line. The district court noted that without the connecting tracks LSG would still have access to its distribution center—presumably by building other "wye" tracks.

Following discussions between LSG and MMR about transportation from the quarry, the railroad company contacted CSX in July of 1986 to secure its participation in the transportation of LSG's aggregates. CSX proposed a rate of $2.95 per ton to transport on its tracks. MMR and LSG concluded that the price given was an "exit offer," an offer not meant to be accepted.

On November 7, 1986, the two companies made a request to CSX that it provide "trackage" rights, the use of its tracks without its trains. MMR and LSG anticipated that such rights would be substantially cheaper at a rate of $.25 per ton. CSX refused the request and stated that it preferred to work with them by adjusting the rates offered rather than to bargain for trackage rights. After this litigation began, CSX made an offer of $2.12 (one cent above its variable costs, by the company's calculations). According to the district court finding, the last rate offer, combined with the $1.55 rate MMR was prepared to charge LSG, still exceeded the transportation costs of LSG's competitor Millville. Millville's quarry was closer to Annapolis Junction than LSG's quarry. Thus, Millville required transportation by CSX rails only.

LSG and MMR allege that the "exit rate" and refusal of trackage rights were prompted by a conspiracy between CSX and Millville Quarry, Inc. to impede competition among suppliers of aggregate materials to the Washington/Baltimore market. LSG and MMR assert that this conspiracy was based on transactions between Millville and CSX that occurred before the rate offer and trackage rights refusal.

Prior to LSG's purchase of the distribution center in 1982, Millville expressed an interest to CSX in establishing a distribution center at Annapolis Junction. It leased a portion of a spur line that ran off the main line at Annapolis Junction. It also owned property adjacent to CSX tracks. Sometime in 1984, CSX leased the remainder of the spur line to Millville.

In 1985, CSX and Millville entered into the first of two "unit" train agreements.[1] The second agreement was made in 1987. Traditionally, companies needing the transportation of aggregates have relied on trucks. CSX tried to promote its services in this area. It had about a 5% market share, largely due to entry into the market by reason of the two unit train agreements with Millville.

On one of the unit train agreements Millville was given a rebate so that the effective rate was between $2.50–2.60 (Charles Town, West Virginia, to Annapolis Junction). The second rate, from Hanover, Pennsylvania, to Annapolis Junction, was $2.80–3.00, depending on volume.

CSX promised Millville a "most favored nations clause" which provided that if CSX granted a competitor of Millville a lower rail rate, Millville would be allowed to terminate its contract.

LSG and MMR contend that Donald Sanchez of CSX and Larry Campbell of Millville entered into the actual conspiracy sometime prior to July 1982. This conspiracy is allegedly demonstrated by the following incidents: [2]

1. *A 1984 lease agreement between CSX and Millville*

This agreement ostensibly blocked LSG from access to its facility at Annapolis Junction. LSG alleges that this site is one of the few rail-served sites in the Washington/Baltimore corridor. Millville's leased spur tracks do block access from LSG to the CSX main railway. As the district court noted, however, access is only blocked *at that particular point.*

2. *CSX's rate increase to Millville's competitor*

CSX allegedly increased the rail rates offered to Rockville Crushed Stone, Inc. ("RCS"), a Millville competitor. The rates

---

**1.** Under a "unit" agreement a rail company agrees to devote an entire train to the transportation of a given product, rather than individual box cars.

**2.** It is pointed out that these events occurred over a five-year period beginning in 1982.

were increased after the parties had agreed on an initial price. It is unclear, however, whether the increase was sought to protect Millville or to simply get a better price.

### 3. CSX's conveyance of Fulton Distribution Facilities to Millville rather than its competitor Baltimore Asphalt and Paving Co. ("BAPCO")

LSG and MMR argue that Millville only sought the facility when it found out about BAPCO's interest in purchasing it for the purpose of distributing stone in the Baltimore area. CSX conveyed the facility to Millville even though the latter already had another distribution facility in the area. Moreover, the facility was never used by Millville once purchased. Millville did, however, make the highest bid.

### 4. CSX offered LSG a noncompetitive rate for the transportation of aggregate materials in order to protect Millville

This issue is the heart of the district court opinion. The court found that the rate (one cent above CSX's variable cost) was still greater than the transportation cost of Millville. It seems that no joint track agreement would have made LSG competitive with Millville, making trackage rights the only economically viable option.

Moreover, LSG executive vice president Ron Matovcik testified that even the $3.38 total joint line rate initially proposed by MMR (which included a $1.83 rate for CSX's portion of the haul) was unacceptable to LSG because it was not competitive with Millville's rate.

MMR and LSG's railroad expert, Richard Levin, expressed skepticism that any rate higher than Millville's "effective rate" of $2.50–2.60 would be acceptable to LSG. Given that MMR wanted a rate of $1.55 for its services, LSG would have only been able to compete with Millville by paying CSX a $1.00 rate. He calculated the cost to CSX at $1.67—1.72.

### III.

■ Fundamentally, for there to be a violation of § 1 of the Sherman Act two or more persons must act in concert. Generally, a business has the right to deal or not deal with whomever it likes, as long as it does so independently. *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). An agreement to restrain trade may be inferred from other conduct. When such conduct is ambiguous, there are two possible judicial interpretations. First, the suspect agreement may be found consistent with independent conduct or a legitimate business purpose. *See Monsanto, supra; Terry's Floor Fashions, Inc. v. Burlington, Inc.*, 763 F.2d 604, 611–12 (4th Cir. 1985). Second, it may be consistent with the illegal agreement. To prove a violation through ambiguous conduct, proof must be offered that tends to exclude the first interpretation. *Id.* Moreover, it must be shown that there is a common scheme to achieve an illegal goal. In *Monsanto* the Supreme Court held that:

> The correct standard is that there must be evidence that tends to exclude the possibility of independent action by the [alleged coconspirators]. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the [conspirators] had a conscious commitment to a common scheme designed to achieve an unlawful objective.

465 U.S. at 768, 104 S.Ct. at 1473.

Specifically in the context of summary judgment, the Supreme Court has held that an antitrust plaintiff must offer evidence that excludes the possibility of independent conduct. In *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Court stated:

> [A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. Thus, in *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 [104 S.Ct. 1464, 79 L.Ed.2d 775] (1984), we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspir-

acy. *Id.*, at 764 [104 S.Ct. at 1470]. See also [*First Nat. Bank of Ariz. v.* ] *Cities Service*, [391 U.S. 253] at 280 [88 S.Ct. 1575, 1588, 20 L.Ed.2d 569 (1968) ]. To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. 465 U.S., at 764 [104 S.Ct. at 1470.]

*Id.* at 588, 106 S.Ct. at 1356.

Given the *Monsanto/Matsushita* standard, LSG and MMR must discharge a twofold evidentiary burden. First, they must establish that CSX and Millville had a "conscious commitment to a common scheme designed to achieve an unlawful objective." Second, LSG and MMR must bring forward evidence that excludes the possibility that the alleged coconspirators acted independently or based upon a legitimate business purpose. As the district court concluded, they were unable to discharge this burden and thus fail on both counts of their complaint.

■ With regard to the first element, there is no direct evidence of a common scheme. Instead, LSG and MMR offer as evidence of a conspiracy transactions between CSX and Millville completed before the rate offer and trackage rights refusal. Moreover, they point to the aforestated incidents as demonstrating a conspiracy.

This evidence, however, fails to exclude the possibility that the denial of trackage rights was a unilateral decision by CSX prompted by legitimate business concerns. Moreover, the rate and rail transactions between CSX and Millville as well as the alleged incidents of conspiracy may have been motivated by lawful business concerns rather than an illicit end.

Undergirding CSX's refusal of trackage rights is the possible and plausible motivation of maintaining a profitable relationship with subsidiary railroads. CSX had a vested interest in continuing to have such companies function as feeder railroads. These smaller railroads, with less track, feed CSX the traffic they are unable to carry. For CSX to rent its track to such a railroad, it

would relinquish one means of profit (providing rail service) for another (providing track) and alter the nature of its business. It is a legitimate purpose to seek to maintain the nature of one's business. Given LSG and MMR's failure to discharge their dual evidentiary burden, the lower court rightly concluded that there had been no violation of § 1.

## IV.

■ The standard for recovery under § 4 of the Clayton Act, 15 U.S.C. § 15, was articulated in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), and *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). In both cases, the Court held that where a series of direct and indirect purchasers claim injury as a result of a seller's misconduct, the direct purchasers are deemed to be the only persons injured in their business or property within the meaning of § 4, and indirect purchasers are not given a right to sue. 392 U.S. at 487, 88 S.Ct. at 2228; 431 U.S. at 746, 97 S.Ct. at 2074. In *Illinois Brick* the Court stated:

> [T]he antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it.

*Id.* at 735, 97 S.Ct. at 2069. The trial court rightly concluded that under such a standard, LSG was an indirect purchaser, and for that reason LSG had no standing to sue.

LSG relies on *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), to argue that § 4 may be read broadly to allow recovery for an injury under common law proximate cause analysis.

In *Blue Shield,* the Court allowed standing for a patient denied reimbursement from a health plan for the use of the services of a psychologist. The Court held that while the conspiracy was directed at psy-

chologists for the benefit of competing psychiatrists, it was the denial of the subscriber's reimbursement that was the means Blue Shield used to effect its conspiracy. 457 U.S. 465, 102 S.Ct. at 2540.

Like the subscriber in *Blue Shield*, LSG would seem to suffer from the alleged conspiracy to inhibit competition in the Baltimore/Washington aggregate market. Moreover, both the refusal of the health plan and that of CSX were the alleged means of the conspiracies. The similarities, however, end here; the dissimilarities between *Blue Shield* and the instant case make the former inapposite. Unlike the subscriber, LSG would have been the focus of the alleged conspiracy. Moreover, the results of the conspiracies were different. While the subscribers suffered direct and readily discernible economic harm from the health plan's refusal to reimburse them for psychological care, LSG's harm from the refusal of trackage rights is discernible but indirect. The subscriber lost money spent for a psychologist's care; LSG only lost potential savings on transportation costs through direct purchaser MMR, and possible profits from trackage rights. Under the *Hanover Shoe/Illinois Brick* standard, LSG as an indirect purchaser has no standing.

## V.

MMR, the only plaintiff on Count II, claimed that CSX's refusal to grant trackage rights was an improper exercise of monopoly power in violation of § 2 of the Sherman Act. The lower court rightly found the claim to be invalid. For MMR to make a § 2 violation claim, it had to demonstrate two facts. First, CSX must have possessed a monopoly power in the market of aggregate transportation (either rail or both nonrail and rail transportation). *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *United States v. Griffith*, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). Second, MMR had to establish that CSX engaged in exclusionary conduct to maintain, use, or extend that power. *Id.* Were CSX a monopolist, a misuse of power could

be shown if there was no legitimate business reason for its conduct. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

■ MMR relies on the essential facilities doctrine to establish its § 2 claim. In order for such a violation to be shown four elements must be proven: (1) control by the monopolist of the essential facility; (2) the inability of the competitor seeking access to practically or reasonably duplicate the facility; (3) the denial of the facility to the competitor; and (4) the feasibility of the monopolist to provide the facility. *See MCI Communications v. American Telephone and Telegraph Co.*, 708 F.2d 1081, 1132-33 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).

■ With respect to the first element, that CSX possessed monopoly power over an essential facility, MMR argues that trackage rights are the only economically practical means of aggregate transportation between Emory Grove and Annapolis Junction. MMR contends that the relevant market is the rail transportation of aggregates to the Washington/Baltimore corridor. Were that the case, CSX is a monopolist as it controls the only rails that would allow MMR to reach the corridor from Emory Grove. Alternatively, the market might be defined as aggregate transportation services, including rail and nonrail. Since MMR fails to meet elements (2), (3), and (4), we need not attempt to determine whether CSX did control an "essential facility."

On the second element, MMR failed to show that it could not reasonably duplicate or pursue a reasonable alternative to the essential facility. There were three alternatives available: building additional tracks, purchasing train service from CSX, and trackage rights. While the first was economically impractical, the second was reasonable from CSX's perspective. CSX's offer of $2.12 per ton, a penny over the variable costs, was reasonable. While such a rate would not have allowed LSG to

compete with Millville's transportation cost, it, however, was still less than the rate Millville paid CSX. Although trackage rights were preferable, that, alone, did not make the rate offer unreasonable.

MMR fails on the third element as well. Access to the essential facility was not refused through the rail rate offer and the trackage rights denial. MMR was not denied access for two reasons. First, the record makes clear that any rate offer over $1.00 would have been more than MMR and LSG could profitably pay. Second, the reasonable standard of the access factor can not be read to mean the assurance of a profit for LSG, and LSG's business for MMR.

Finally, MMR fails on the feasibility element. The feasibility of providing access to the tracks must be analyzed not in terms of all the possibilities of CSX as a railroad, but in the context of its normal course of business. There is no evidence that CSX rents track to subsidiary railroads. Within its existing course of business, providing rail transportation service, it is not feasible for CSX to rent track to MMR. CSX has articulated a number of legitimate business reasons for refusing trackage rights, including altering its relationship to "feeder" lines, upon which it relies for profitable traffic. As the district court noted, for CSX to rent track, it would alter its relationship to feeder railroads and transform itself into a "toll collector." It is not feasible for CSX as a transportation service-provider to grant trackage rights. The decision as to Count II is affirmed.

## VI.

For the reasons discussed above, the district court's grant of summary judgment in favor of CSX is affirmed.

AFFIRMED.