**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MERCK-MEDCO MANAGED CARE,
LLC,
<u>Plaintiff-Appellant,</u>

v.

RITE AID CORPORATION; EAGLE
MANAGED CARE CORPORATION, a
Subsidiary of Rite Aid Corporation;

GIANT FOOD, INC.; EPIC PHARMACY
NETWORK, INCORPORATED;
NEIGHBORCARE PHARMACIES,
INCORPORATED,
<u>Defendants-Appellees,</u>

NATIONAL PRESCRIPTION
ADMINISTRATORS, INCORPORATED,
<u>Movant.</u>

No. 98-2847

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Benson E. Legg, District Judge.
(CA-96-499-L)

Argued: June 8, 1999

Decided: September 7, 1999

Before MICHAEL, Circuit Judge,
HOWARD, United States District Judge for the
Eastern District of North Carolina, sitting by designation,
and FRIEDMAN, United States District Judge
for the Eastern District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** James Patrick Tallon, SHEARMAN & STERLING, New York, New York, for Appellant. Lewis A. Noonberg, PIPER & MAR-BURY, L.L.P., Washington, D.C.; Glenn Alfredo Mitchell, STEIN, MITCHELL & MEZINES, Washington, D.C., for Appellees. **ON BRIEF:** Kenneth M. Kramer, Daniel D. Edelman, SHEARMAN & STERLING, New York, New York; Thomas M. Wilson, III, John B. Isbister, Scott Patrick Burns, TYDINGS & ROSENBERG, L.L.P., Baltimore, Maryland, for Appellant. Leonard L. Gordon, Kenneth G. Starling, Susan H. Pope, PIPER & MARBURY, L.L.P., Washington, D.C., for Appellees Rite Aid and Eagle; David U. Fierst, Andrew Beato, STEIN, MITCHELL & MEZINES, Washington, D.C., for Appellee Giant Food; Michael F. Brockmeyer, Jay I. Morstein, PIPER & MARBURY, L.L.P., Baltimore, Maryland, for Appellee Epic; Ward B. Coe, III, Pamela M. Conover, WHITEFORD, TAY-LOR & PRESTON, L.L.P., Baltimore, Maryland, for Appellee NeighborCare.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

The managed health care industry has drastically changed the way medical and pharmaceutical services are dispensed in this country. Where individuals once stopped at their local drug store to fill a prescription, people now shop almost exclusively in those stores which service the health benefit plans provided by their employers. Competition is keen over what company will administer an employer's health plan.

In September 1995, the State of Maryland awarded to the appellant, Merck-Medco Managed Care, Inc. ("Medco"), a contract to manage the prescription drug benefits program for State employees and retirees (the "Maryland Plan" or the "Plan"). Under the terms of the award, Medco was required to assemble an extensive statewide network of pharmacies which would agree to fill prescriptions at a steeply discounted rate.

The Maryland Plan was scheduled to go "live" on January 1, 1996. By mid-December 1995, the State had grown concerned about Medco's ability to put together a satisfactory network in time. On December 20, 1995, the State issued an ultimatum to Medco, requiring Medco to submit a certified list of participating pharmacies within three days. Because Medco failed to assemble a network satisfactory to the State, the State terminated Medco's contract on December 27, 1995. Ultimately, the State rebid the contract and awarded it to one of Medco's competitors.

The appellees own or represent approximately one-half of the retail pharmacies in Maryland. Four of the appellees were engaged in the retail pharmacy business in 1995. Rite Aid operated 180 pharmacies in Maryland. Giant, a supermarket, had 76 stores in Maryland and each included a pharmacy. NeighborCare operated 20 pharmacies in Maryland, all of which were located in hospitals or medical centers. EPIC is an umbrella organization that represented the interests of over 200 independently owned pharmacies. The fifth appellee, Eagle, is a wholly owned subsidiary of Rite Aid and a direct competitor of Medco. In partnership with EPIC, Eagle was an unsuccessful bidder for the Maryland contract.

Both Eagle and Medco are Pharmacy Benefits Managers ("PBM"). PBMs were created in response to the rising costs of pharmaceutical products. They seek to keep prices down by pooling claims. A PBM will contract with a plan sponsor, such as the State of Maryland, and for a fee, will manage the drug benefits program for the sponsor's employees. The PBMs put together a network of participating pharmacies. To be included in the network, the pharmacies must agree to dispense drugs at a discount. For each prescription filled, the PBM reimburses the pharmacy under a formula based on the drug's average wholesale price ("AWP") less a percentage, plus a dispensing fee. For

3

the Maryland Plan, the network pharmacies were to be reimbursed at a rate of AWP minus 15% plus $2.00. The PBM that can offer the greatest price discount gains an advantage in winning the contracts of large employers.

Pharmacies can decide to either join or not join a network and numerous factors influence their decision. These factors include the number of people covered by the plan, the pharmacy's market share, the PBM's reputation for prompt payment and whether a particular network is "open" or "closed." "Open" networks permit any pharmacy to enter or exit at any time. "Closed" networks fix the membership at a certain date and no other pharmacies can join afterwards. Pharmacies are more willing to accept deep discounts in a"closed" network because they are more certain of their market share. The incentive to join an "open" network comes from an increase in volume of customers to the pharmacy who typically buy other incidental items for sale at the pharmacy, like magazines and non-prescription drugs. Increased volume is difficult to measure.

Some PBMs, like Medco, fill prescriptions by mail and, therefore, are not only administering the network but are also directly competing with the pharmacies in the network. Medco, as a subsidiary of Merck, a very large drug manufacturer, has a substantial advantage in discounting the price of prescription drugs. This practice by drug manufacturers has prompted retail pharmacies to file a suit in federal court in Chicago alleging pricefixing, conspiracy and other antitrust violations. Hundreds of similar lawsuits from around the country have been consolidated before the United States District Court for the Northern District of Illinois.

During the time leading up to the filing of this lawsuit, the retail pharmacies in Maryland were not only attempting to determine if they should become part of Medco's network, but they were also attempting to have fair pricing laws enacted and attempting to carve out pharmacy benefits from a transfer of the state Medicare population into managed care.

After receiving bids from PBMs, the State awarded the contract to Medco on September 13, 1995, based on its representation that over 800 pharmacies would be members of the open network. Medco made

this prediction without contacting any of the pharmacies and provided a list to the State of the pharmacies Medco expected to be in the network. This list included all appellees except NeighborCare. The contract required Medco to assemble participation by 86.3% of Maryland's pharmacies by January 1, 1996. Medco was unsuccessful in assembling the network because over half of Maryland's pharmacies refused to participate in the plan. Medco accused Rite Aid of leading a conspiracy to sabotage Medco's network.

On February 20, 1996, Medco filed the instant suit against appellees, alleging that they jointly agreed to sabotage the Plan by boycotting Medco's network and that appellees' actions constituted a violation of § 1 of the Sherman Antitrust Act and the Maryland Antitrust Act. Section 1 of the Sherman Act prohibits any conspiracy the object of which is to restrain trade or commerce.

After extensive discovery, the parties filed cross-motions for summary judgment, and after holding four hearings, the district court granted the appellees' motion for summary judgment on the antitrust claims and granted the appellant's motion for summary judgment as to some ancillary claims. In an 83-page decision, the district court concluded that Medco's evidence did not tend to exclude the possibility of independent conduct on the part of the appellees and the evidence was, therefore, insufficient to support a reasonable inference of a conspiracy to violate the antitrust laws.

Medco alleges that numerous actions by appellees indicate a conspiracy, such as: an advertisement placed in the Baltimore Sun and Washington Post by Rite Aid on December 21, 1995; various conference calls between the different pharmacies; denials of communication; statements by corporate officers; and, reactions of appellees. Medco catalogs over 450 instances of contact between defendants and others from September 11, 1995, to December 27, 1995.

In its answer, Rite Aid alleged that its Vice President of Government and Trade Relations, Jim Krahulec, did not discuss the Maryland Plan with any of the other appellees. In an unrelated case, Krahulec signed a Federal Trade Commission consent decree promising that he would not attend a formal or informal meeting of representatives of pharmacy firms that he expects, or reasonably should

expect, will facilitate communications concerning the firms' participation in managed care benefit plans. Medco produced evidence that Krahulec participated in conversations with other pharmacies in which discussion of the Maryland plan occurred.

Discovery produced evidence that on September 15, 1995, Rite Aid's Senior Vice President, Joel Feldman, called Giant's Assistant Director of Managed Care Programs, Gary Wirth, and informed him that Medco received the contract. There was also a conference call on September 15 between EPIC and Rite Aid and another on September 17 involving Rite Aid, NeighborCare and others. Other conference calls occurred on September 18 involving Krahulec (Rite Aid), Giant, NeighborCare and representatives from the National Association of Chain Drug Stores; on September 19 involving Krahulec and NeighborCare; and, on September 20 involving Rite Aid and Giant.

I. STANDARD OF REVIEW

The court reviews a summary judgment motion by a district court de novo. Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). Defendants bear the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985). When making the summary judgment determination, the facts and all reasonable inferences must be viewed in the light most favorable to the nonmoving party. See Anderson, 477 U.S. at 255. Defendants can bear their burden either by presenting affirmative evidence, or by demonstrating that Medco's evidence is insufficient to establish its claim. See Celotex Corp., 477 U.S. at 331 (Brennan, J., dissenting).

Once defendants have met their burden, Medco must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring Medco for a jury to return a verdict for it. See Anderson, 477 U.S. at 250.

6

The standard for summary judgment therefore mirrors the standard for judgment as a matter of law under Fed. R. Civ. P. 50(a), viz. a trial court must grant a judgment if, under the governing law, there can be but one reasonable conclusion as to the verdict. See Anderson, 477 U.S. at 250. A trial judge faced with a summary judgment motion "must ask himself not whether he thinks the evidence unmistakenly favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id. at 252.

In opposing summary judgment, the non-moving party must "set forth such facts as would be admissible in evidence." Fed. R. Civ. P. 56(e). Inadmissible hearsay cannot be used to oppose summary judgment. See Greensboro Prof. Fire Fighters Ass'n v. Greensboro, 64 F.3d 962, 967 (4th Cir. 1995).

At oral argument, counsel for Medco succinctly stated the issues in this appeal -- what is Medco's burden under the summary judgment standard and did Medco meet its burden?

II. SUMMARY JUDGMENT IN ANTITRUST CASES

While the summary judgment standard of Fed. R. Civ. P. 56 for an antitrust suit is the same as that for any other action, the application of Rule 56 to antitrust cases is somewhat unique. The inferences to be drawn from underlying facts on summary judgment must be viewed in a light most favorable to Medco. See Matsushita, 475 U.S. at 587. "But antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case . . . conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Id. (citing Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752 (1984)); see also Thompson Everett, Inc. v. National Cable Advertising, L.P., 57 F.3d 1317, 1323 (4th Cir. 1995) ("[I]nferences which may be drawn vary from one substantive area of the law to another. . . .").

Section 1 of the Sherman Antitrust Act states in relevant part:

> Every contract, combination in the form of trust or other-
> wise, or conspiracy, in restraint of trade or commerce

7

among the several States, or with foreign nations, is hereby declared illegal.

15 U.S.C. § 1 (West 1997). To prove a violation of this statute, Medco must establish: first, that there are at least two persons acting in concert and, second, that the restraint complained of constitutes an unreasonable restraint on trade or commerce. See Estate Constr. Co. v. Miller & Smith Holding Co., Inc., 14 F.3d 213, 220 (4th Cir. 1994).

A. Unreasonable Restraint on Trade

Medco must establish that an agreement among appellees not to participate in Medco's plan would be an unreasonable restraint on trade.

Certain restraints on trade are per se violations "which presume[ ] that the questionable conduct has anticompetitive effects without comprehensive inquiry into whether the concerted action produced adverse, anticompetitive effects." In re Baby Food Antitrust Litigation, 166 F.3d 112, 118 (3rd Cir. 1999); see also Oksanen v. Page Memorial Hospital, 945 F.2d 696, 708 (4th Cir. 1991) ("Certain forms of agreements, such as varieties of group boycotts, have been classified as per se violations."). Medco asserts a per se violation of § 1 and appellees do not contest this characterization.[1]

Because Medco has alleged a per se violation of § 1, it is unnecessary for the court to evaluate appellees' conduct under the rule of reason which involves a case-by-case determination of whether the methods are anticompetitive and should be prohibited. See id.; see also Oksanen, 945 F.2d at 709 (discussing rule of reason test).

_____

[1] We believe that the characterization of appellees' alleged conduct as a per se violation of § 1 is appropriate. Most boycotts have been considered per se violations of § 1. Only boycotts having valid business justifications and procompetitive effects may possibly be considered under a rule of reason analysis. See, e.g., Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2 (1984). If appellees committed the acts alleged, the state's cost for administering the Plan would have increased and competition among PBMs would have been adversely affected, thereby resulting in an unfair restraint of trade.

8

B. Conspiracy

A plaintiff alleging conspiracy must demonstrate a"conscious commitment to a common scheme designed to achieve an unlawful objective." Thompson Everett, Inc. v. National Cable Advertising, L.P., 57 F.3d 1317, 1324 (4th Cir. 1995) (quoting Monsanto, 465 U.S. at 764). Monsanto requires "something more" than independent action, and must rise to the level of "a unity of purpose or a common design and understanding, or a meeting of minds." Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc., 878 F.2d 801, 805 (4th Cir. 1989) (quoting Monsanto, 465 U.S. at 764).

A party may demonstrate an agreement by direct evidence or circumstantial evidence. When relying upon circumstantial evidence, the range of permissible inferences that the court may draw from the evidence is limited by the "plausibility of the plaintiff's theory and the danger associated with such inferences." In re Baby Food, 166 F.3d at 124. A plaintiff may have a plausible theory, but the danger to the market or innocent participants in the market may be so great as to warrant a limitation of the inferences available to the plaintiff. Consequently, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita, 475 U.S. at 588 (citing Monsanto, 465 U.S. at 764).

Therefore, to withstand a motion for summary judgment, "a plaintiff seeking damages for a violation of § 1 must present evidence that tends to exclude the possibility that the alleged competitors acted independently." Id. The heart of this case is to what degree Medco must produce evidence tending to exclude independent action by defendants and whether Medco has presented such evidence. The standards for summary judgment and the limits on inferences in antitrust lawsuits are often quoted but not universally agreed upon. The Supreme Court has considered numerous antitrust appeals and through Matsushita, Monsanto and Eastman Kodak v. Image Technical Services, 504 U.S. 451 (1992), has established a framework within which to analyze antitrust summary judgment motions.

9

1. Matsushita and Monsanto

Matsushita involved a suit filed by American TV manufacturers alleging a 20-year conspiracy by Japanese TV manufacturers to unfairly price their products in America in violation of the Sherman Antitrust Act. The American manufacturers alleged that the intent of the conspiracy was to force the Americans out of business by fixing prices below the market level in the United States. The losses sustained in the American market were offset by monopoly profits in the Japanese markets.[2] The Supreme Court concluded that "to survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence `that tends to exclude the possibility' that the alleged conspirators acted independently." Id. at 588. The Supreme Court borrowed the "tends to exclude the possibility" language from the Court's earlier Monsanto decision.

Monsanto was a vertical antitrust case. The plaintiff, Spray-Rite, alleged that Monsanto, an agricultural herbicide manufacturer, along with its distributors, fixed the price of herbicide and unfairly prejudiced the plaintiff, a former distributor of Monsanto's products. The case went to trial and Spray-Rite won a $10 million judgment that was upheld on appeal. The Supreme Court affirmed the judgment but on different grounds than those of the district or appellate courts. The Supreme Court held that "something more than evidence of complaints [about price fixing] is needed. There must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." Monsanto, 465 U.S. at 764.

Appellant attempts to distinguish Monsanto and Matsushita on the grounds that one was a vertical antitrust case and the other was a horizontal antitrust case.[3] We do not agree that the cases turned on this

_____

[2] This agreement by Japanese manufacturers is called a horizontal antitrust claim because it deals with manufacturers banding together to unlawfully control a price.

[3] By making this distinction, appellant attempts to convince the court that because Monsanto was a vertical antitrust case, it does not apply to horizontal antitrust cases. Therefore, we cannot rely on it to analyze the horizontal antitrust dispute between Medco and appellees.

distinction because the Supreme Court in Matsushita, decided after Monsanto, specifically held that in the absence of direct evidence of a conspiracy, "to survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence `that tends to exclude the possibility' that the alleged conspirators acted independently." Matsushita, 475 at 588. The Court later stated that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Id.

2. Eastman Kodak Company v. Image Technical Services

Eastman Kodak did not involve a conspiracy claim under § 1 of the antitrust act as did Monsanto and Matsushita. In Eastman Kodak, the Court considered whether Eastman Kodak's market power was sufficient to find it guilty of "tying." Tying deals with the ability of a market participant to condition the sale of product A on the purchase of product B. A market participant can violate § 1 of the Sherman Antitrust Act "if the seller has `appreciable economic power' in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market." Eastman Kodak , 504 U.S. at 462 (quoting Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495 (1969)).

Kodak did not dispute that it began a program to condition the sale of replacement parts for its copiers on the use of Kodak service and repair programs. This policy adversely affected the independent servicers of Kodak equipment. Kodak also did not deny that its arrangement affected a substantial volume of commerce. However, Kodak denied that its practices were an unlawful tying arrangement. Kodak asserted that competition in a market foreclosed the finding of monopoly power in certain instances. Kodak further argued that the court's failure to adopt its view would deter procompetitive behavior. See id. at 467.

Kodak relied on Matsushita in attempting to convince the court that if Kodak had a plausible economic theory, then the plaintiffs' claims could not make sense; thus, entitling Kodak to summary judgment. In discussing Kodak's summary judgment burden, the Court rejected Kodak's proposed presumption that "equipment competition pre-

11

cludes any finding of monopoly power in derivative aftermarkets."**4** Id. at 466. The Court explained:

> The . . . requirement in Matsushita that the plaintiffs' claims make economic sense did not introduce a special burden on plaintiffs facing summary judgment in antitrust cases. The Court did not hold that if the moving party enunciates any economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment. Matsushita demands only that the nonmoving party's inferences be reasonable in order to reach the jury . . . .

Id. at 468.

Because of the Court's response to Kodak's argument, Medco relies on Eastman Kodak to dismiss its requirement under Monsanto and Matsushita to produce evidence that tends to exclude that the defendants acted independently. However, we do not read Eastman Kodak as reaching that far. The Court was not dealing with a § 1 conspiracy in Eastman Kodak as it was in Monsanto and Matsushita. It was dealing with monopoly power under § 2 of the Antitrust Act. The Court did not overrule Monsanto and Matsushita with this statement, and it would be a mistake to dismiss the requirements imposed on Medco due to the inherent dangers to the market and innocent parties associated with a conspiracy case.

Our conclusion that Eastman Kodak did not overrule or modify the requirements explained in Matsushita and Monsanto is further bolstered by Fourth Circuit precedent. In Thompson Everett, this court recognized that "on summary judgment motions in antitrust cases, the Supreme Court instructed that when there is evidence of conduct that is consistent with both legitimate competition and an illegal conspiracy, courts may not infer that an illegal conspiracy has occurred without other evidence." 57 F.3d at 1323; see also Blomkest Fertilizer, Inc. v. Potash Corporation of Saskatchewan, Inc., 176 F.3d 1055, 1074 (8th Cir. 1999), vacated, reh'g en banc granted ("Eastman

---

**4** Kodak presented no statistical evidence in support of its economic theory.

12

Kodak was not concerned with the sufficiency of the evidence of conspiratorial acts") (Beam, J., dissenting); Super Sulky, Inc. v. United States Trotting Ass'n, 174 F.3d 733 (6th Cir. 1999) (relying on Matsushita to grant summary judgment in § 1 case without discussing Eastman Kodak); RE/MAX International, Inc. v. Realty One, Inc., Nos. 96-3362, 96-3469 and 96-3470, 1999 WL 184350, ___ F.3d ___ (6th Cir. April 6, 1999) (relying on principles of Matsushita and Monsanto to reverse district court's grant of summary judgment on § 1 claim); In re Baby Food Antitrust Litigation, 166 F.3d 112 (same as Super Sulky).

Therefore, Medco must forecast evidence which tips the balance in favor of a conspiracy. If it is as likely that the conduct was lawful as it was conspirational, it is improper to let the case proceed to trial.

In Laurel Sand & Gravel, Inc. v. CSX Transportation, Inc., 924 F.2d 539 (4th Cir. 1990), we described the antitrust summary judgment procedure. When there is no direct evidence of antitrust activity, "an agreement to restrain trade may be inferred from other conduct." Id. at 542.

There are two possible judicial interpretations when the conduct to restrain trade is ambiguous. The first interpretation is that the "suspected agreement may be found consistent with the independent conduct or a legitimate business purpose." Id.  The second interpretation is that the agreement may be consistent with an illegal agreement. "To prove a violation through ambiguous conduct, proof must be offered that tends to exclude the first interpretation." Id. We concluded,

> [g]iven the Monsanto/Matsushita standard, [plaintiffs] must discharge a twofold evidentiary burden. First, they must establish that [defendants] had a "conscious commitment to a common scheme designed to achieve an unlawful objective." Second, [plaintiffs] must bring forward evidence that excludes the possibility that the alleged coconspirators acted independently or based upon legitimate business purpose.

Id. at 543.

13

The district court correctly noted that the quantum of evidence required to exclude the possibility of independent action or legitimate business purposes is directly related to the plausibility of the plaintiff's theory. Compare Matsushita, 475 U.S. 574, and Super Sulky, 174 F.3d 733, with Monsanto, 465 U.S. 752, and Petruzzi's IGA Supermarkets v. Darling-Delaware Co., 998 F.2d 1224, 1242-43 (3d Cir.), cert. denied, 510 U.S. 994 (1993). If the plaintiff advances a strong, plausible theory then the quantum of evidence tending to exclude independent action is not as great as if the plaintiff advances a weak or implausible theory. Likewise, when there is a risk that the threat of antitrust liability will chill legitimate, procompetitive conduct by market participants, the quantum of evidence is also high.

C. Conscious Parallelism

An agreement to boycott may be inferred from the business conduct of the parties. This pattern of uniform business practices is commonly referred to as "conscious parallelism." See ABA Section of Antitrust Law, Antitrust Law Developments, p. 8 (4th ed. 1997). The Court of Appeals for the Third Circuit has explained that courts may find consciously parallel behavior where a plaintiff shows: "(1) that the defendants' behavior was parallel; [and] (2) that the defendants were conscious of each other's conduct and that this awareness was an element in their decision-making process." Id. n.39 (quoting Petruzzi's IGA, 998 F.2d at 1242-43).

There is no doubt that conscious parallelism was at work in appellees' business conduct. Through newspaper articles and trade organization meetings, Rite Aid, EPIC, NeighborCare and Giant were each aware that the other had not participated in the Maryland Plan. Each also knew that if not enough pharmacies participated, the State would likely cancel the contract with Medco and award the contract to another pharmaceutical benefits manager that would offer better terms than Medco. However, it has long been recognized that parallel behavior alone is not enough to prove a conspiracy. See Theatre Enterprises v. Paramount Film Distributing Corp., 346 U.S. 537, 540 (1954) ("[T]his Court has never held that proof of parallel business behavior conclusively establishes agreement or, phrased differently, that such behavior itself constitutes a Sherman Act offense.").

14

In order to infer a conspiracy, conscious parallelism must be accompanied by "plus factors." While the Supreme Court has not recounted a list of plus factors, numerous plus factors, such as "motive to conspire," "opportunity to conspire," "high level of interfirm communications," irrational acts or acts contrary to a defendant's economic interest, but rational if the alleged agreement existed, and departure from normal business practices, have been considered by other circuits. See City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 571 n.35 (11th Cir. 1998); Apex Oil Co. v. DiMauro, 822 F.2d 246, 253-54 (2d Cir.), cert. denied, 484 U.S. 977 (1987).

If a party establishes the existence of plus factors, a rebuttable presumption of conspiracy arises. See In re Baby Food, 166 F.3d at 122; Todorov v. DCH Healthcare Authority, 921 F.2d 1438, 1456 n.30 (11th Cir. 1991). Viewing all the evidence and taking the plus factors into consideration, the court must then determine if the evidence tends to exclude the possibility that the alleged coconspirators acted independently or based upon legitimate business purposes.

### III. APPLICATION OF THE STANDARD FOR ANTITRUST CASES TO MEDCO'S FORECAST OF EVIDENCE

In order to survive summary judgment, Medco must first forecast evidence of a conspiracy to restrain trade. If successful, Medco must then demonstrate evidence that tends to exclude independent action by the defendants.

### A. Conscious Commitment to a Common Scheme

Medco has asserted a plausible theory of conspiracy. If the alleged conspiracy succeeded, the State would rescind the contract with Medco and the conspirators would likely receive more lucrative reimbursements from the next pharmaceutical benefits manager. If the conspiracy failed, the conspirators could merely join Medco's network after the plan went live.

While Medco's theory is plausible, it also creates a danger of chilling legitimate, procompetitive activity by other pharmaceutical service providers. A low quantum of proof tending to exclude

15

independent action in cases such as this would threaten pharmacies with antitrust litigation when they have legitimate, procompetitive reasons for not joining a plan. Incentives to negotiate, to hold out for better terms and ultimately to not participate would have to be weighed in the light of a possible lawsuit if other pharmacies engaged in the same activities.

As discussed above, Medco has presented sufficient evidence that conscious parallelism occurred among appellees during the fall of 1995. Therefore, the court must examine the plus factors in order to determine if a conspiracy may be inferred from appellees' consciously parallel behavior.

1. Motive to Conspire

Rite Aid, Giant, NeighborCare and EPIC owned or controlled 50% of the pharmacies in Maryland. Medco's plan proposed deep cuts in profits from the pharmacies' previous plan. Additionally, Rite Aid had been sanctioned by the United States Justice Department for antitrust actions in New York where they conspired to boycott a Medco plan. Thus, construing all reasonable inferences in Medco's favor, it appears that the defendants had a motive to conspire against the Medco plan.

2. Opportunity to Conspire and High Level of Inter-Firm Contacts

Medco presented voluminous evidence of inter-firm contacts between the parties providing ample opportunity to conspire. The inter-firm contacts occurred between high level corporate officers. Reasonable inferences from this evidence establishes opportunity to conspire and high level of inter-firm contacts.

3. Acts Contrary to Economic Interest

Evidence of acts contrary to an alleged conspirator's economic interest is perhaps the strongest plus factor indicative of a conspiracy. Having reviewed the record, we conclude that rejecting the Medco plan was consistent with the pharmacies' economic interests. Particu-

16

larly, NeighborCare's involvement would have been directly contrary to its economic interest. Ninety-eight percent of NeighborCare's business consisted of prescriptions. They did not sell ancillary items that Medco promised would make up for the lower reimbursement rate.

Also, it was in each company's best interest to hold out as long as possible in an effort to attain a better deal with Medco. Due to the plan's "open" nature, if the company did not receive better terms, it could merely join at a later date. Medco presents no evidence of price sharing among appellees. All indications from the evidence point to independent negotiations by Giant, NeighborCare and EPIC with Medco concerning the rate of reimbursement. Consequently, there are no acts by appellees inconsistent with their economic best interests.

4. Departure From Normal Business Practices

Medco has not asserted a departure from normal business practices. In fact, Medco concedes that both Giant and Rite Aid had a history of holding out until the last minute and negotiating for a better reimbursement rate. NeighborCare had never joined a plan with a reimbursement rate as low as the one offered by Medco. Only EPIC departed from the normal business practice of binding all 200 independent pharmacies at the Medco rate.

B. Appellees' Evidence Rebutting the Inference of Conspiracy

Medco's establishment of two plus factors requires appellees to rebut the resulting inference of conspiracy. The district court painstakingly reviewed the evidence presented by Rite Aid, Giant, EPIC and NeighborCare offered to rebut the inference of conspiracy.[5]

_____

[5] The district court relied in part on the Noerr-Pennington doctrine. Medco assigned error to the district court's reliance on this doctrine because defendants had not affirmatively raised it in their pleadings. Under this doctrine, horizontal competitors may join together to lobby the government. The First Amendment shields this joint lobbying from antitrust liability, even when the competitors are seeking governmental action that would eliminate competition or exclude competitors. We do not believe it is necessary to invoke the Noerr-Pennington doctrine to affirm the district court's decision.

17

1. Rite Aid

Eagle, Rite Aid's subsidiary, submitted an unsuccessful bid for the Maryland Plan. As a result of the unsuccessful bid, Eagle and EPIC launched a bid protest on September 18, 1995. Eagle and EPIC contended that the State's failure to verify the accuracy of Medco's proposal amounted to an arbitrary and capricious award of the contract to Medco. As evidence of Medco's inaccurate proposal, Eagle relied on Medco's representation to the State that Rite Aid would join Medco's network.[6] Rite Aid asserts that becoming a member of Medco's network while Eagle was protesting the award of the contract would undercut Eagle's appeal.

Rite Aid also presented evidence that part of its business practice was to initially decline participation in a plan and bargain for the best terms they could;[7] particularly when the plan was open and there was no risk that they would be shut out if they did not join before the plan went live.

According to Rite Aid, the low reimbursement rate offered by Medco did not attract Rite Aid. Rite Aid presented evidence that its decision to join a plan at such a low reimbursement rate was governed by how large the plan was, Rite Aid's market share, whether the plan was open or closed and the prominence of the plan's sponsor. Rite Aid asserts that due to Rite Aid's prominent market share in Maryland,[8] it was not quick to sacrifice prescription profits for unproven ancillary income.

2. Giant

Giant presented evidence that they had forecasted a loss of over $1 million if they joined Medco's network at the offered reimbursement

_____

[6] Medco contends this is normal business practice in the industry.
[7] Medco representatives admitted that Rite Aid typically held out before joining a plan and that Rite Aid's Joel Feldman was "a great negotiator."

[8] In 1995, Rite Aid had 180 pharmacies in the State of Maryland.

18

rate. Since the beginning of 1995, Giant had been in the process of abandoning plans[9] with rates similar to those Medco offered.

Evidence presented by Giant indicates that Giant was deeply concerned about Medco's mail order program. According to Giant, their participation in another plan administered by Medco caused a loss of 225,485 prescriptions per year to Medco's mail order program, valued at over $10 million. Giant engaged in negotiations with Medco through December 1995, attempting to bargain for"reasonable" reimbursement rates.

3. EPIC

EPIC asserts that its board chose not to participate in the Maryland Plan because of the low reimbursement rate and because of slow payments by Medco in other plans in which EPIC was involved. Medco requested to address EPIC's board two times in an attempt to convince them to join Medco's network. The board offered to participate in a plan with a rate of AWP minus 12% plus $2.00, but Medco and EPIC were unable to reach an agreement. However, EPIC allowed Medco to directly solicit the independent pharmacies over which EPIC had contractual binding authority. Medco's solicitation yielded the participation of 100 independent pharmacies.

Additionally, EPIC was involved in the bid protest along with Eagle, and EPIC contends that until their protest was denied in late November 1995, they had absolutely no incentive to join Medco's network.

4. NeighborCare

NeighborCare had never participated in a plan with a reimbursement rate as low as the one offered by Medco. NeighborCare's two owners had a longstanding policy to reject any networks offering reimbursement rates which fell below their profitability threshold.

_____

[9] Giant had dropped out of nine plans due to the reimbursement rate. Eight of the nine plans had rates greater than or equal to Medco's rate.

19

NeighborCare also did not engage in the sale of ancillary items to which an increase in customer flow would contribute. Ninety-eight percent of NeighborCare's profits came from prescriptions.

Based on the evidence presented by Rite Aid, Giant, EPIC and NeighborCare, we are convinced that they have rebutted Medco's inference of conspiracy. Medco may still survive summary judgment if it carries its ultimate burden and forecasts proof which tends to exclude independent action or legitimate business decisions by appellees.

C. Medco's Evidence Tending to Exclude Independent Action or
      Legitimate Business Purpose

Medco does not forecast direct evidence of a conspiracy to restrain trade, but relies on circumstantial evidence. It advances at least seven factual arguments that purportedly demonstrate a conspiracy and exclude independent action: (1) appellees' reaction as soon as Maryland announced its plan; (2) the reaction of EPIC which had historically joined a plan at the price offered by Medco; (3) the actions of Rite Aid's Jim Krahulec; (4) the statement on September 29 by EPIC's representative that the plan would "kill us" if it went into effect; (5) Rite Aid's advertisement; (6) conversations between high level officers within appellees' companies; and (7) statements by EPIC and Giant on December 7, 1995.

1. Appellees' Reaction to Announcement of Award of
      Contract to Medco

No pharmacy reacted with joy to the news that Maryland had awarded Medco the pharmacy plan. The deep discount Medco attempted to achieve in its pricing forecasted large losses to some appellees.[10] The offset to this deep discount was intended to be an increased flow of patrons to the pharmacies, but for pharmacies like NeighborCare, which derived 98% of profits from prescriptions, an increase in the sale of incidentals like magazines and candy could not make up for the loss in prescription dollars.

_____

[10] Giant predicted that it would lose in excess of $700,000 per year by joining the Plan at Medco's rate.

20

After learning on September 11, 1995, of the State's intention to award the contract to Medco at a Board of Public Works meeting on September 13, Rite Aid's Joel Feldman testified that "we were really focused on developing a strategy to somehow influence the process politically" comparable to a "red alert." (A. 451) The "red alert" was implemented by "get[ting] on the telephone and . . . call[ing] as many people as you can who you think will have some role in influencing the decision of the Board of Public Works." Id.

As indicated by the flurry of activity after the announcement, most pharmacies,[11] not just appellees, attempted to address concerns raised by the award of the Plan to Medco. The thrust of these activities appears to be influencing the governor and state representatives to rethink some of the details of the Plan.

2. EPIC's Reaction to the Plan

Medco asserts EPIC's reaction to the plan creates an inference of conspiracy. EPIC was "up in arms" over the contract price Medco was offering even though they had always accepted contracts for similar prices in the past.

EPIC counters that it needed to accept low reimbursement rates in the past in order to prove that it could deliver on the participation of its 200 independent pharmacies. Now that EPIC had established that their pharmacies would honor contracts entered into on their behalf by EPIC, the board felt that it was time to seek higher rates of reimbursement. EPIC's board voted not to participate after brief negotiations with Medco due to the low rate and delays in payments by Medco on other contracts. If EPIC's board had voted to accept the contract, all 200 independent pharmacies would be bound by their decision. Rather than accept the rate, EPIC gave Medco permission to directly solicit the individual pharmacies.

_____

[11] As indicated by conference call participation, not only did appellees take part in the lobbying effort, but so did Safeway Inc., Thrift Drug, Inc., Revco D.S. Inc., CVS and the National Association of Chain Drug Stores.

21

### 3. Actions of Rite Aid's Jim Krahulec

Medco contends that the presence of Jim Krahulec at trade organization meetings and conference calls raises an inference of conspiracy given Krahulec's past activity. Krahulec entered into a consent judgment with the Federal Trade Commission ("FTC") whereby the FTC ordered him not attend "a formal or informal meeting of representatives of pharmacy firms that [he] expects or reasonably should expect will facilitate communications . . . concerning one or more firms' intentions or decisions with respect to entering into, refusing to enter into, threatening to refuse to enter into . . . any existing or proposed participation agreement . . ." (A.57).

### 4. EPIC's Statement that the Plan "Would Kill Us"

Jim Miller, EPIC's representative at a September 29 meeting of the Maryland Association of Chain Drug Stores, stated that he did not "know why we're having a meeting to discuss the Medicaid waiver considering that if the Maryland deal went through it would kill us."

EPIC negotiated with Medco until mid-December, giving Medco's representative numerous opportunities to address the board concerning the merits of Medco's plan. Even after rejecting Medco's plan, EPIC permitted direct solicitation of the independent pharmacies resulting in participation by half of them in Medco's network.

### 5. Rite Aid's Advertisement

Medco also contends that the advertisement that Rite Aid ran in the Baltimore Sun and the Washington Post is evidence of a conspiracy. When Rite Aid ran the ad, none of the other retailers gave Rite Aid permission to include their names, and none of them protested that their names were included.

As justification for its actions, Rite Aid relies on a December 19, 1995, article in the Baltimore Sun announcing that "three large chains and a network of independent pharmacies said yesterday that they are refusing to participate in the state employee's drug plan." (A. 60) Rite Aid allegedly ran the advertisement on December 21, because it felt

22

that it should explain to its customers why it was not participating and wanted to make a public statement concerning the State's award of the contract to Medco. The advertisement asked State employees to contact the governor or their union to seek a change in the Plan and listed other pharmacies that had refused to participate in the Plan.

6. Conversations Between High Level Corporate Officers

As a forecast of evidence from which a reasonable inference of conspiracy may be drawn, Medco also relies on telephone conversations and September 15, 17, 18, 19 and 20 conference calls, and the appellees' failure to remember these conversations. In their answer to Medco's complaint, appellees denied having ever talked to each other. Later, in deposition testimony, representatives of Rite Aid, EPIC and NeighborCare testified under oath that they had not communicated with their competitors regarding the Maryland Plan. When new evidence surfaced, appellees admitted talking about the plan but submitted that they were only lobbying or that they had simply forgotten their prior conversations.

It challenges logic to assert that individuals concerned about the loss of millions of dollars to a new pharmacy plan would simply forget conversations about the plan. Evidence of these forgotten conversations is Medco's strongest argument for reversal of the district court's summary judgment order. This evidence must be viewed in light of all the evidence in determining if Medco has carried its ultimate burden of establishing a reasonable inference of a conspiracy.

7. Statements by EPIC and Giant on December 7, 1995

Finally, Medco asserts that statements made by NeighborCare and Giant on December 7, 1995, that Medco "would not have a network," excludes the possibility of independent action. This statement, along with the selective memories of appellees' corporate officers regarding their telephone conversations, does not meet the quantum of proof required to establish lack of independent action.

8. Evidence as a Whole

"[A] court should not tightly compartmentalize the evidence put forward by the nonmovant, but instead should analyze it as a whole

23

to see if together it supports an inference of concerted action." Petruzzi, 998 F.2d at 1230. Taking all of the evidence together, the court is not convinced that Medco has presented evidence to support an inference of concerted action. Two examples of an inference of conspiracy presented by Medco, fail under closer review.

The district court concluded that to infer improper restraint of trade from the advertisement was pure speculation, and we agree. There was no reason for the other retailers to object to Rite Aid's justification for their collective failure to join the network.

Medco contends that EPIC's failure to join the network was not a mere coincidence, but that EPIC's actions indicate a conspiracy. However, the court does not believe that a conspirator would permit Medco to essentially invalidate its decision not to participate by allowing Medco to directly solicit its independent pharmacies. A conspiracy based on EPIC's actions is not a reasonable inference from the facts.

We must avoid the danger of an inevitable competition chilling result that would occur should a low quantum of proof be required before a party may harness the power of the Sherman Antitrust Act against facially legitimate, procompetitive business practices. Viewing all the plus factors presented by Medco, the rebuttal by appellees and the additional evidence Medco asserts tends to exclude independent action, we conclude that Medco has not met the threshold of forecasting the quantum of proof required for its claims to survive summary judgment. All of the evidence viewed together does not create a reasonable inference of conspiracy.

Had Medco been able to forecast evidence of activity that was completely outside of normal business practices in negotiating for healthcare networks, actions not in the best economic interests of the appellees or an utter failure to negotiate with Medco along with the record of appellees' communications, this likely would be a different case.

Medco has failed to establish that the evidence is more consistent with conspiracy than with independent action. Medco's forecast of evidence does not tend to exclude the possibility that the pharmacies'

24

decisions were independent or were made for legitimate business reasons. Thus, viewing the facts in a light most favorable to appellant, Medco has failed to present material issues of disputed fact necessitating a trial.

## IV. CONCLUSION

For the reasons stated above, we conclude that the district court properly ruled that no genuine issue of material fact exists on the issue of Medco's claim that the defendants conspired to boycott the Maryland Plan. The district court correctly found that Medco failed to forecast sufficient evidence tending to exclude independent conduct by the defendants. Therefore, the ruling of the district court is

AFFIRMED.

25