Filed: June 6, 2003

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 02-1337
(CA-01-736-3)

Cavalier Telephone, LLC,

Plaintiff - Appellant,

versus

Verizon Virginia, Incorporated,

Defendant - Appellee.

O R D E R

The court amends its opinion filed May 20, 2003, as follows:

On page 9 -- the designation for the footnote is corrected, from "1" to "*."

On page 26, first full paragraph, line 8 -- the word "true" is deleted; the words now read "may prove that it ...."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CAVALIER TELEPHONE, LLC,
    *Plaintiff-Appellant,*

    v.

VERIZON VIRGINIA, INCORPORATED,
    *Defendant-Appellee,*

INTEGRITY TELECONTENT,
*Movant.*

COVAD COMMUNICATIONS COMPANY;      No. 02-1337
AT&T CORPORATION;
ASSOCIATION FOR LOCAL
TELECOMMUNICATIONS SERVICES,
*Amici Supporting Appellant.*

UNITED STATES TELECOM
ASSOCIATION; BELLSOUTH
CORPORATION; SBC COMMUNICATIONS,
INCORPORATED,
*Amici Supporting Appellee.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
James R. Spencer, District Judge.
(CA-01-736-3)

Argued: January 23, 2003

Decided: May 20, 2003

Before WIDENER and NIEMEYER, Circuit Judges, and
Morton I. GREENBERG, Senior Circuit Judge of the United States
Court of Appeals for the Third Circuit, sitting by designation.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Widener joined. Senior Judge Greenberg wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** David William Carpenter, SIDLEY & AUSTIN, Chicago, Illinois, for Appellant. Richard Gary Taranto, FARR & TARANTO, Washington, D.C., for Appellee. **ON BRIEF:** Stephen T. Perkins, Alan M. Shoer, Donald F. Lynch, III, CAVALIER TELEPHONE, Richmond, Virginia, for Appellant. John Thorne, Christopher M. Arfaa, VERIZON, Arlington, Virginia; Anne Marie Whittemore, Richard Cullen, Robert Michael Tyler, MCGUIREWOODS, L.L.P., Richmond, Virginia; Mark C. Hansen, Aaron M. Panner, KELLOGG, HUBER, HANSEN, TODD & EVANS, P.L.L.C., Washington, D.C.; Andrew Gerald McBride, WILEY, REIN & FIELDING, L.L.P., Washington, D.C., for Appellee. Margaret A. Robbins, Antony Richard Petrilla, COVAD COMMUNICATIONS COMPANY, Washington, D.C., for Amicus Curiae Covad. Jonathan M. Askin, ASSOCIATION FOR LOCAL TELECOMMUNICATIONS SERVICES, Washington, D.C.; David L. Lawson, Ryan D. Nelson, SIDLEY, AUSTIN, BROWN & WOOD, L.L.P., Washington, D.C.; Mark C. Rosenblum, Lawrence J. Lafaro, AT&T CORPORATION, Basking Ridge, New Jersey, for Amici Curiae AT&T, et al. Lawrence E. Sarjeant, Indra Sehdev Chalk, Robin E. Tuttle, UNITED STATES TELECOM ASSOCIATION, Washington, D.C.; James F. Rill, Scott E. Flick, HOWREY, SIMON, ARNOLD & WHITE, L.L.P., Washington, D.C.; Sanford M. Litvack, DEWEY BALLANTINE, L.L.P., New York, New York; James R. Young, HUNTON & WILLIAMS, McLean, Virginia; Kimberly A. Newman, HUNTON & WILLIAMS, Washington, D.C., for Amicus Curiae U.S. Telecom. Michael W. McConnell, Salt Lake City, Utah; Marc Gary, J. Henry Walker, Marc W.F. Galonsky, BELLSOUTH CORPORATION, Atlanta, Georgia; Stephen M. Shapiro, Jeffrey W. Sarles, MAYER, BROWN, ROWE & MAW, Chicago, Illinois; James D. Ellis, William M. Schur, SBC COMMUNICATIONS, INC., San Antonio, Texas, for Amici Curiae BellSouth, et al.

---

2

**OPINION**

NIEMEYER, Circuit Judge:

This appeal presents the question of whether the allegations of the complaint in this case, which state ostensible violations of §§ 251 and 252 of the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) (codified at 47 U.S.C. § 151 *et seq*.), state a claim of a monopolization violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

Cavalier Telephone, LLC ("Cavalier") entered the local telecommunications service business pursuant to an interconnection agreement with Verizon Virginia, Incorporated ("Verizon"), an incumbent provider of telecommunications services in central and northeastern Virginia. The agreement made Verizon's lines and facilities available for use by Cavalier, as mandated by the Telecommunications Act. Problems in the implementation of the interconnection agreement, which Cavalier contends were deliberately created by Verizon to exclude Cavalier as a competitor, prompted Cavalier to file this action, alleging, among other things, that Verizon monopolized or attempted to monopolize the relevant telecommunications market, in violation of § 2 of the Sherman Act.

The district court granted Verizon's motion to dismiss the antitrust claims under Federal Rule of Civil Procedure 12(b)(6), concluding that Cavalier's allegations "merely represent violations of the 1996 [Telecommunications] Act dressed up in antitrust garb." For the reasons that follow, we affirm.

I

The facts for purposes of this appeal are those alleged in Cavalier's complaint, which we take to be true in deciding whether Cavalier stated a claim under § 2 of the Sherman Act upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6); *Estate Constr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 217-18 (4th Cir. 1994).

Cavalier, a corporation whose principal place of business is in Richmond, Virginia, was formed in 1998 to enter into the business of

3

providing basic telecommunications services to customers in the Richmond, Tidewater, and Northern Virginia areas. Cavalier defines basic telecommunications services to include traditional local telephone service, dial-up Internet access, digital subscriber line (DSL) services, high-capacity voice and data services, voice mail, access to long-distance services, and any other service that could be provided over copper wire and fiber-optic cable linking consumers with the office of a service provider. This portion of a copper wire or fiber-optic network that takes telecommunications services into individual homes and businesses is commonly referred to as the "last mile" of facilities.

Until 1996, the predecessor of Verizon, a company also located in Richmond, was the telecommunications franchisee in the Richmond, Tidewater, and Northern Virginia areas that had been regulated by the Commonwealth of Virginia as a natural monopoly. Verizon owns the last-mile wire and cable facilities in its service area.

In 1996, Congress enacted the Telecommunications Act of 1996 (the "Telecommunications Act" or the "1996 Act") to promote competition in local telecommunications markets. The 1996 Act opens local telecommunications services to competition and requires existing telecommunications service providers, referred to in the Act as incumbent local exchange carriers ("ILECs"), to enter into interconnection agreements that make their facilities available to new entrants in the market, often referred to as competing local exchange carriers ("CLECs"), such as Cavalier. Also in 1996, Virginia lifted its ban on competition in local telecommunications markets, authorizing the State Corporation Commission to grant certificates to applicants proposing to furnish local exchange telephone service in the service territory of another certificate holder. Va. Code § 56-265.4:4.C. The Virginia State Corporation Commission, however, retained continuing supervision over the services provided by existing and competing carriers.

Acting under the authority of the Telecommunications Act, Cavalier leased telecommunications facilities from Verizon by entering into a comprehensive interconnection agreement with Verizon's predecessor dated January 13, 1999, that was approved by the Virginia State Corporation Commission. The interconnection agreement states

4

that Verizon "has undertaken to make such terms and conditions available to Cavalier hereby only because of and, to the extent required by, Section 252(i) of the [Telecommunications] Act," which required Verizon to make interconnections, services, and network elements available to Cavalier to the same extent as provided to another party through another interconnection agreement pursuant to the Telecommunications Act. Through the interconnection agreement, Verizon agreed (1) to resell its telecommunications services to Cavalier; (2) to lease and make available trunks to permit Cavalier to interconnect with Verizon's operations; (3) to allow access to Verizon's network elements; (4) to participate in "collocation," i.e., allowing Cavalier to have a location in Verizon's central offices to house Cavalier's equipment; (5) to allow access to Verizon's equipment; and (6) to facilitate telephone number portability. The agreement also governed the process by which Verizon was to bill Cavalier and made provision for the resolution of disputes.

As enabled by the interconnection agreement, Cavalier acquired customers in the Richmond, Tidewater, and Northern Virginia areas, and by the fall of 2001, it provided services to customers over approximately 100,000 telephone lines through its access to facilities owned by Verizon.

Shortly after the interconnection agreement was approved by the State Corporation Commission, problems in implementation of the agreement developed between Cavalier and Verizon. According to Verizon, after July 2000, Cavalier did not pay "one cent for those lines or for listing services that Verizon has provided, and now owes Verizon approximately $17 million." Verizon acknowledges that some of that amount was disputed but that over $9 million was undisputed. It asserts that even with respect to the $9 million amount due, Cavalier's president "refused to allow any money to be paid to Verizon because doing so would reduce Cavalier's `leverage' in negotiating with Verizon."

But Cavalier's complaint filed in this case, which we must accept as true at this stage, describes a significantly different and larger problem that developed between the parties.

*First*, Cavalier alleges that Verizon erected obstacles to Cavalier's interconnection with Verizon's network "by delaying the provision of

5

trunks [communication lines linking Cavalier's and Verizon's systems] required for Cavalier to compete and by not establishing adequate trunks to carry telephone traffic between Cavalier's customers and Verizon's customers." Cavalier asserts that the inadequate trunking blocked between 25% and 70% of calls intended for Cavalier's customers and caused "a complete outage for Cavalier in northern Virginia."

*Second*, as to collocation, Cavalier alleges that Verizon "used its control over the central office to raise Cavalier's costs, delay competition, and blockade entry." Cavalier points to Verizon's initial decision to charge $400,000 for a 10-foot-by-10-foot area for "space preparation" and its subsequent decision to charge only $47,686.20, an amount Cavalier contends was still "far higher than comparable charges for the same space preparation in states such as Massachusetts and Rhode Island." Cavalier also alleges that Verizon delayed the provision of space, "forc[ing Cavalier] to wait over 600 days for space in some Verizon central offices," and that Verizon charged non-competitive prices and imposed "arbitrary and unnecessarily complex and burdensome rules for collocation."

*Third*, as to Cavalier's ability to order facilities and services from Verizon, Cavalier complains that Verizon "made the process of identifying and ordering last-mile facilities excessively lengthy, complex, and expensive." Cavalier also alleges that Verizon's employees made misrepresentations to existing or potential customers of Cavalier after Cavalier requested customer service records from Verizon. In addition, Cavalier alleges that the methods Verizon provided for ordering last-mile facilities were inferior, stating that they were either "frequently slow or completely `down' for the entire day" or "[did] not function as well, or in the same manner as, the systems that Verizon itself uses."

*Fourth*, in the area of assignment of facilities, Cavalier alleges that, when Verizon assigned last-mile facilities to Cavalier, it used "systems and procedures that [were] intentionally flawed and unnecessarily complex, delay-ridden, and expensive." For example, Cavalier alleges that Verizon's database had "inaccuracies" that led Verizon to "refuse[ ] to connect facilities to a certain port that Verizon [said did]

6

not exist or [was] already being used by another customer," even when such was not the case.

*Fifth*, as to Verizon's provision of its last-mile facilities, Cavalier alleges that Verizon used "systems and procedures that [were] flawed, overly complex, delay-ridden, and expensive." Cavalier claims that Verizon "refuse[d] to provide Cavalier with last-mile facilities on integrated digital loop carriers . . . which serve [d] almost 25% of Verizon's lines in Virginia." Integrated digital loop carriers were designed to eliminate steps in providing telecommunications services and thus yield significant savings in equipment and operations. Cavalier contends that Verizon's explanation that provision of the facilities was not "technically feasible" was unsupportable, given that other companies provide access to such last-mile facilities. Cavalier also claims that the facilities that Verizon provided "had a disproportionately high number of problems" and that Verizon "also imposed costs on Cavalier's existing or potential customers through the premature disconnection of customers who unexpectedly los[t] telephone service in the process of switching to Cavalier as their provider of Basic Telecommunications Services." In addition, Cavalier alleges harm from "Verizon's intentionally costly approach to both directory assistance and directory publications." And Cavalier complains that Verizon's rates were anticompetitive, stating that Verizon "proposed to offer [last-mile facilities] services at a price lower than Cavalier's `retail' cost for high-capacity facilities, or at a price so low that Cavalier could not profitably offer such services if forced to obtain last-mile facilities at `retail' cost."

*Sixth*, Cavalier complains that Verizon "imposed an unnecessarily complex, lengthy, and expensive process for Cavalier to mount its fiber on Verizon's utility poles or to pull its fiber th[r]ough conduit systems owned by Verizon," delaying Cavalier's network building "as long as 250 days." Cavalier also complains that Verizon was "disingenuous[ ]" when it claimed that Cavalier's requested process for using Verizon's spare fiberoptic cable was not "technically feasible." Cavalier alleges that when Verizon did provide its spare cable, Cavalier experienced problems in that "Verizon interrupted all service to Cavalier's northern Virginia switch for a period of several hours."

And *seventh*, Cavalier complains of Verizon's "error-laden" bills. Cavalier alleges that Verizon's bills suffered from "application of the

7

wrong rate elements and non-compliance with conditions imposed by the [Merger Order between Bell Atlantic Corporation and GTE Corporation forming Verizon]." Cavalier complains that Verizon's billing "burdened Cavalier with voluminous paper bills that Verizon refuse[d] to provide in electronic format, [leaving] Cavalier unaware of how much it truly owe[d] and thus unable to plan its financing reliably, and serv[ing] as a pretense for Verizon to deny and threaten to deny the continued provision of services."

The complaint asserts that Verizon served approximately 90% of the relevant market — i.e., local telecommunications service in the Richmond, Tidewater, and Northern Virginia geographical areas — and that through the seven categories of activities alleged in the complaint, Verizon monopolized or attempted to monopolize the relevant market, in violation of § 2 of the Sherman Act and the analogous Virginia statute:

> Verizon has attempted to, and has, maintained its monopoly power in the relevant product and geographic markets through a series of exclusionary acts, each of which is aimed at either reducing or eliminating Cavalier's ability to reach end users, or raising the costs to Cavalier of competing with Verizon.

The complaint also alleges that Verizon's activities violated the Lanham Act, the Communications Act of 1934, the Merger Order between Bell Atlantic Corporation and GTE Corporation forming Verizon as approved by the FCC, and the Uniform Trade Secrets Act. It also alleges that Verizon's conduct amounted to tortious interference with contract, tortious interference with prospective economic advantage, intentional or negligent misrepresentation, and breach of contract, all under Virginia law. Cavalier demanded $135 million in treble damages, $500 million in punitive damages, injunctive relief, and attorneys fees and costs.

Shortly after commencing this action, Cavalier filed a motion for a temporary restraining order and a preliminary injunction, which the district court denied. Verizon then filed a motion to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), which the district court granted by order dated March 27, 2002, rely-

8

ing on Rule 12(b)(6) to dismiss Cavalier's federal claims and Rule 12(b)(1) to dismiss its state-law claims. In disposing of the claims asserted under the Sherman Act and the analogous Virginia statute, the district court stated:

> It is evident that Cavalier is not asserting a monopolization claim under the Sherman Act, but rather is detailing alleged violations of duties imposed upon Verizon by the 1996 [Telecommunications] Act. Often the issue is not whether Verizon is providing the facility or service as directed by the 1996 Act, but whether Verizon is providing the facility or service to Cavalier in a manner that fits within the standard of reasonableness established by the 1996 Act. Regardless of whether such factual allegations have merit, they do not state a claim for monopolization.

From the district court's order, Cavalier filed this appeal, initially challenging all of the rulings made by the district court in dismissing the complaint. Prior to oral argument, however, Cavalier limited its appeal to the contention that its complaint states viable claims of monopolization and attempted monopolization under federal and State law,* abandoning its appeal of all other issues.

## II

Cavalier contends that when the district court found that Cavalier's allegations amounted to ostensible violations of the Telecommunications Act of 1996, it erred in failing to analyze whether the same allegations also stated claims under the Sherman Act, particularly when the court recognized that the antitrust claims were not precluded through any implied repeal of, or immunity from, the antitrust laws. Cavalier challenges as error the district court's conclusion that Cava-

---

* While Cavalier brought its monopolization and attempted monopolization claims under both federal and State antitrust laws, Va. Code § 59.1-9.6,-9.12, there does not seem to be any dispute between the parties that disposition under the federal law also justifies a similar disposition under the State statute. *See Oksanen v. Page Memorial Hosp.*, 945 F.2d 696, 710 (4th Cir. 1991) (noting that Virginia follows federal law on antitrust issues).

lier "cannot state a claim under § 2 of the Sherman Act if it alleges violations of affirmative duties created by the 1996 Act." Cavalier maintains to the contrary that even if conduct violates the Telecommunications Act, it can also violate § 2 of the Sherman Act:

> [I]f Verizon's alleged conduct consisted of exclusionary acts sufficient to state a claim for violation of § 2 of the Sherman Act, and the 1996 [Telecommunications] Act also happens to regulate some (or even all) of that conduct, then that anticompetitive conduct would almost certainly also violate affirmative, pro-competitive duties under the 1996 Act.

Cavalier maintains that the district court, by failing to recognize this, improperly immunized Verizon from antitrust liability based on the Telecommunications Act. When conducting the antitrust analysis, Cavalier states that it met its burden by alleging (1) a relevant market, (2) anticompetitive conduct by Verizon aimed at maintaining Verizon's "near-complete monopoly of that relevant market," and (3) anticompetitive effects that included driving or attempting to drive Cavalier out of business and depriving consumers of lower prices, better services, and innovation.

Verizon contends that the allegations of Cavalier's complaint set forth "only complaints about Verizon's implementation of its regulatory duties to help Cavalier," imposed by the Telecommunications Act. It asserts that without the 1996 Act, Cavalier could not demand such "affirmative-assistance duties." Verizon notes that under established antitrust principles, a lawful monopolist has no general duty to help its competitors, even though it can be prohibited from active, unjust impairment of a competitor's efforts to challenge the monopoly. Accordingly, it concludes that the affirmative-assistance duties set forth in the Telecommunications Act exist "outside the parameters of pre-existing antitrust law" and that alleged breaches of those duties, while ostensibly constituting violations of the Telecommunications Act, do not constitute violations of the Sherman Act.

The requirements for alleging a monopolization claim are well known. Section 2 of the Sherman Act provides in relevant part:

> Every person who shall monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several

10

States, or with foreign nations, shall be deemed guilty of a felony.

15 U.S.C. § 2. The Clayton Act makes this provision enforceable by "any person . . . injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15. To state a monopolization claim under § 2, a plaintiff must allege (1) that the defendant possesses monopoly power in the relevant market and (2) that the defendant willfully acquired or maintained that power "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 481 (1992) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). Conduct that merely has the consequence of shutting out competition does not rise to the level of anticompetitive behavior subject to antitrust liability; the monopolist must have acted with the intent to prevent competitors from entering the market. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985) (noting that intent is a necessary element of claims under § 2); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973) ("Use of monopoly power `to destroy threatened competition' is a violation of the `attempt to monopolize' clause of § 2 of the Sherman Act").

Cavalier's complaint, contending that Verizon, as a monopolist, deliberately attempted to exclude Cavalier from the relevant market, does conclusorily allege all of the required elements of a monopolization claim under § 2 of the Sherman Act. But the breaches of duties on which those allegations depend and which the complaint attributes to Verizon require us to determine, by looking at the complaint in its entirety, whether the complaint's allegations advance a legal theory on which antitrust relief can be granted. *See* Fed. R. Civ. P. 12(b)(6); *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 401 (7th Cir. 2000).

Both parties recognize that Cavalier's allegations state breaches of duties imposed by the Telecommunications Act and by the interconnection agreement. That Act required Verizon to surrender its theretofore legal monopoly and to lease its facilities to carriers such as Cavalier who wished to compete in the market. Accordingly, Cavalier entered into competition with Verizon by entering into an interconnection agreement with it as mandated by the Telecommunications

11

Act. *All* of the untoward conduct attributed to Verizon in the complaint arises from duties imposed on Verizon by the Telecommunications Act. Thus, for example, Cavalier alleges that Verizon delayed the provision of trunk lines, provided inadequate trunk lines, charged Cavalier too much for collocation, delayed the provision of collocation space and made collocation arrangements unnecessarily complex, made procedures for obtaining last-mile facilities overly complex, which delayed Cavalier's access to such facilities, provided inferior facilities, delayed Cavalier's network building, and submitted overly complex and even erroneous bills to Cavalier. All of these alleged failures are failures in the performance of duties set forth in the interconnection agreement, and, as that agreement provides, Verizon would not have entered into such an agreement except as required by the Telecommunications Act.

Cavalier alleges that the motives behind Verizon's breaches of its duties under the 1996 Act were to exclude Cavalier as a competitor and to preserve the monopoly that Verizon had enjoyed before 1996, in violation of the Sherman Act. To determine whether these allegations are sufficient to state an antitrust claim, it is necessary to review the role and scope of the Telecommunications Act and its special relationship to the Sherman Act.

The Telecommunications Act amended the Communications Act of 1934, ch. 652, 48 Stat. 1064 (1934) (codified at 47 U.S.C. § 151 *et seq*.). Even before the enactment of the Communications Act of 1934, Verizon's ancestor, the American Telephone and Telegraph Company ("AT&T"), operated as a natural monopoly. By 1934, AT&T owned 80% of the local telephone lines and services in the United States. *Goldwasser*, 222 F.3d at 392. When Congress passed the Communications Act in 1934, it established the Federal Communications Commission ("FCC") and imposed a scheme that divided regulation of AT&T and others on the basis of intrastate and interstate services. The Communications Act vested the FCC with authority previously exercised by the Interstate Commerce Commission over *interstate* matters and left *intrastate* matters to State public utility commissions. 47 U.S.C. § 152 (granting the FCC authority to regulate "interstate and foreign communication by wire or radio" but preventing it from regulating "intrastate communication service"); *see also Bell Atlantic Md., Inc. v. MCI WorldCom, Inc.*, 240 F.3d 279, 299 (4th Cir. 2001),

12

*vacated on other grounds sub nom. Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635 (2002). The Communications Act, however, did not break up the natural monopoly held by AT&T through its "Bell System." Rather, it regulated AT&T in its interstate services by requiring it to provide services at "just and reasonable" rates. 47 U.S.C. § 201. The Act permitted duplication of services and competition only when "public convenience and necessity require[d]" it. *Id.* § 214(a).

Following a lawsuit commenced by the United States against AT&T, which alleged that AT&T violated the antitrust laws, Judge Harold Greene of the United States District Court for the District of Columbia approved a settlement in 1982 through a consent decree that broke up AT&T and required it to divest itself of, among other things, the Bell operating companies that were providing local services. *United States v. AT&T*, 552 F. Supp. 131 (D.D.C. 1982). By then, AT&T had become the largest corporation in the world "by any reckoning." *Id.* at 151-52. Under the consent decree, "long-distance service" or interstate service was opened up to competition, but local service remained in the hands of regional Bell operating companies subject to regulation as natural monopolies by State utility commissions.

The government's suit against AT&T was legitimized by Judge Greene's rulings that anticompetitive conduct attributed to AT&T in both interstate and local markets was not immunized or protected by either the Communications Act of 1934 or by State law except to the extent that those laws expressly authorized and pervasively regulated the anticompetitive conduct. *See id.* at 154-59; *United States v. AT&T*, 461 F. Supp. 1314, 1320-24 (D.D.C. 1978). Finding nothing to that effect in either the Communications Act or State law as to AT&T's *interstate* conduct, Judge Greene permitted the government to proceed on its Sherman Act claims against AT&T. But the companies, including Verizon, that were spun off as the product of AT&T's break-up were permitted to continue to operate in local markets under monopoly franchises conferred by State utility commissions, and they were not subject to the antitrust laws regarding their regulated conduct.

That all changed with the enactment of the Telecommunications Act of 1996 and with Virginia's repeal of its monopoly grant to Veri-

13

zon earlier the same year. With the passage of the Telecommunications Act, Congress made local-services markets open to competition as had been the case for long-distance services pursuant to the AT&T consent decree. The stated purpose of the Act was to "promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, 56 (1996). Congress sought to "provide for a pro-competitive, de-regulatory national policy framework designed *to accelerate* rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition." H.R. Conf. Rep. No. 104-458, at 1 (1996); S. Conf. Rep. No. 104-230, at 1 (1996) (emphasis added).

To further its local-competition goal, the Telecommunications Act imposes duties on incumbent local exchange carriers or ILECs to provide access to their facilities and equipment to competing carriers. 47 U.S.C. § 251. More particularly, in § 251(a) and (b), the 1996 Act imposes on every telecommunications carrier an affirmative duty to interconnect with other carriers, to follow stated rules regarding resale, and to provide nondiscriminatory access to telephone numbers and operator services, telephone poles, ducts, conduits, and rights-of-way. *Id.* § 251(a), (b). Under § 251(c), the incumbent local exchange carrier bears additional duties, including the duty to negotiate interconnection agreements with any new carrier so requesting, to provide access to its network elements on an unbundled basis, to offer its retail telecommunications services for resale at wholesale rates, and to provide for collocation. *Id.* § 251(c). Section 252 governs negotiation and arbitration of interconnection agreements. *Id.* § 252. Agreements voluntarily made may be entered into without regard to the specific duties imposed by § 251(b) and (c). Section 252 identifies the procedure for agreements reached through mandatory arbitration, which are not exempted from the requirements outlined in § 251. In short, §§ 251 and 252 of the 1996 Act imposed commands on incumbent local exchange carriers to interconnect with and assist new would-be competitors — obligations that telecommunications carriers did not previously have and would not have had under a free-market regime. Within two years after the 1996 Act's enactment, approxi-

14

mately 5,400 agreements were reached under § 252. *See* United States Telephone Association, Competition in the Local Loop, *at* http://www.usta.org/blileyft.html (Dec. 10, 1998).

Through the Telecommunications Act, Congress also substantially altered oversight responsibility previously exercised by the FCC and by State commissions. Compared to its authority under the Communications Act of 1934, the FCC was given a much stronger role under the 1996 Act in regulating the telecommunications industry. Its new role also released the District of Columbia District Court from oversight responsibilities under the 1982 consent decree. And although States continue to play an important role in local markets, the FCC has the responsibility of coordinating the national telecommunications market and thus is given the authority to control a significant part of the telecommunications scheme. In furtherance of the new role of the FCC, the Telecommunications Act granted the FCC authority, after notice and comment, to preempt the laws of any States that prohibited competition in local telecommunications services markets, bringing under federal control much of the transition from regulated local monopolies to free-market industry. *See* 47 U.S.C. § 253(d).

Thus, although "deregulatory in tone," the 1996 Act is nonetheless still "regulatory in effect." Peter W. Huber et al., *Federal Telecommunications Law* 210 (2d ed. 1999). Congress "broadly extended its law into the field of intrastate telecommunications," even though in a few areas such as interconnection agreements, it left control with State regulatory commissions rather than subjecting the field to complete federal control or releasing the industry to the invisible hand of the free market. *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 385 n.10 (1999). Although the 1996 Act removed "pillars of traditional regulation" associated with protected monopolies, the Act imposes other requirements — "some 100 pages of impenetrably dense and convoluted prose" — to transition the industry from monopolies to competition. *See* Huber et al., *supra*, at 53-54. "The sheer volume of regulation has increased dramatically," placing the industry "at the high-water mark of regulation." *Id.* at 1, 5.

Consistent with its pro-competitive purpose and with the findings made by Judge Greene about the applicability of the antitrust laws to

15

AT&T, the Telecommunications Act provides that telecommunications companies continue to be subject to the antitrust laws:

> [N]othing in this Act or the amendments made by this Act, shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws.

§ 601(b)(1), 110 Stat. at 143 (codified at 47 U.S.C. § 152 note). In a similar vein, the general savings clause states that "this Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments." *Id.* § 601(c)(1). Consistent with these provisions, the FCC explained in adopting regulations implementing §§ 251 and 252 of the 1996 Act that "nothing in sections 251 or 252 or our implementing regulations is intended to limit the ability of persons to seek relief under the antitrust laws, other statutes, or common law." *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 F.C.C.R. 15499 at ¶ 129.

The parties to this case do not dispute the general principle that they are subject both to the regulation of the Telecommunications Act and to the applicable principles of existing antitrust laws. *See Law Offices of Curtis V. Trinko, L.L.P. v. Bell Atlantic Corp.*, 305 F.3d 89, 109 (2d Cir. 2002) ("The savings clause unambiguously establishes that there is no `plain repugnancy' between the Telecommunications Act and the antitrust statutes"), *cert. granted*, 71 U.S.L.W. 3571-72 (Mar. 10, 2003) (No. 02-682); *Covad Communications Co. v. Bell-South Corp.*, 299 F.3d 1272, 1280 (11th Cir. 2002) ("It is clear that plain repugnancy cannot be found between the 1996 Act and the antitrust laws in view of the 1996 Act's express language reserving the applicability of the antitrust laws"); *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 401 (7th Cir. 2000) ("Our principal holding is thus not that the 1996 Act confers implied immunity on behavior that would otherwise violate the antitrust law. Such a conclusion would be troublesome at best given the antitrust savings clause in the statute"). But simply noting the conclusion that companies subject to regulation under the Telecommunications Act are not thereby immunized from the antitrust laws does not address the special relationship between the laws that is necessary to understand in order to resolve the issue

16

presented in this case — whether the particular allegations in Cavalier's complaint state a monopolization claim when that claim is based on duties imposed by the Telecommunications Act. Stated otherwise, while the provisions of the Telecommunications Act do not limit the applicability of the antitrust laws to Verizon, we must still determine whether violations of §§ 251 and 252 of the Telecommunications Act as alleged in the complaint before us support a claim under the antitrust laws.

We begin the analysis by noting that the process for fostering competition changed dramatically with the enactment of the Telecommunications Act. We observe that even though the antitrust laws' applicability is preserved and their purpose of promoting competition is similar to the Telecommunications Act's purpose of creating competition in local telecommunications markets, Congress adopted independent methods for giving effect to the two laws' purposes, and the difference in those methods is material to reaching the appropriate disposition of this case.

When enacting the Telecommunications Act, Congress could well have elected to rely only on the antitrust laws to create competition in local telecommunications markets by simply implementing the Supremacy Clause to preempt State laws that granted exclusive franchises in local markets. But foreseeing the inefficiency of that approach, Congress opted to take the proactive approach of creating new duties under the Telecommunications Act. By "jump-starting" and "accelerating" the creation of competition in the local markets through enactment of §§ 251 and 252 of the Telecommunications Act, Congress imposed more dramatic obligations on the local monopolies than would have been imposed simply by subjecting them to preexisting antitrust liability. This was necessary because the antitrust laws alone do not require legitimate monopolies to give up their monopolies or to help competitors. Even under the essential facilities doctrine applied in *Otter Tail*, 410 U.S. 366, a legal monopoly cannot be forced to get into a business it was not traditionally in simply to respond favorably to a new competitor's demand for use of its facilities. In *Otter Tail*, the utility *was* in the business of wheeling power and selling electricity at wholesale, and its refusal to engage in such business with municipalities that posed a competitive threat to the utility was found to be an improper maintenance of monopoly power.

17

*Id.* at 370, 377-79. But if a company such as Verizon, which was a longstanding legal monopoly, were asked to share its office space and to rent its telephone lines and other facilities to a competitor when it was not already in the business of renting office space, lines, or facilities, it could have legally refused the request to expand into such a business without violating § 2 of the Sherman Act. *See Goldwasser*, 222 F.3d at 400 ("These are precisely the kinds of affirmative duties to help one's competitors that we have already noted do not exist under unadorned antitrust laws"); *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 929 (4th Cir. 1990) (observing that a lawful monopolist generally has no duty to help its competitors).

Once it is recognized that the creation of competition in local markets through enforcement of the antitrust laws could be slow and inefficient, then Congress' adoption of the Telecommunications Act as a parallel but distinctly different approach to jump-start and accelerate competition can be understood. As a leading backer of the Telecommunications Act in the Senate stated, the enactment of the Telecommunications Act "is kind of almost a jump-start . . . this legislation says you will not control much of anything. You will have to allow for nondiscriminatory access on an unbundled basis to the network functions and services of the Bell operating companies network that is at least equal in type, quality, and price to the access [a] Bell operating company affords to itself." *Verizon Communications, Inc. v. FCC*, 535 U.S. 467, 488 (2002) (quoting the remarks of Senator Breaux, 141 Cong. Rec. 15572 (1995)); *see also Goldwasser*, 222 F.3d at 399 ("[I]n an effort to jump-start the development of competitive local markets, [Congress] imposed a host of special duties on [incumbent local exchange carriers]"). And similarly, the Conference Reports explained that enactment of the Telecommunications Act was intended to "accelerate" competition in local markets. *See* H.R. Conf. Rep. No. 104-458, at 1; S. Conf. Rep. No. 104-230, at 1.

In furtherance of its intent to jump-start or accelerate competition in local markets through means independent of the antitrust laws, Congress enacted §§ 251 and 252 of the Telecommunications Act to impose *entirely* new duties, which were in addition to the duties imposed by § 2 of the Sherman Act. *See Verizon Communications*, 535 U.S. at 528 ("The wholesale market for leasing network elements is something brand new" under the Telecommunications Act). Under

18

§§ 251 and 252 of the Telecommunications Act, an incumbent telecommunications carrier must assist a competitor's entry into the market by entering into an interconnection agreement, reselling service, and making facilities available. *See* 47 U.S.C. § 251(c); *Verizon Communications, Inc.*, 535 U.S. at 491-92. These obligations exceed the duties imposed by the antitrust laws, and failure to fulfill them would not have supplied the foundations of a monopoly claim. *See Goldwasser*, 222 F.3d at 400 ("A complaint like this one, which takes the form `X is a monopolist; X didn't help its competitors enter the market so that they could challenge its monopoly; the prices I must pay X are therefore still too high' does not state a claim under Section 2"). Moreover, even though duties imposed by law might serve to support a monopoly claim where the duties were violated with anticompetitive intent, we conclude, as explained below, that the special, indeed idiosyncratic, relationship between the Telecommunications Act and the Sherman Act prevents the Sherman Act from taking on the role of enforcing duties imposed for the first time by the Telecommunications Act.

That it was Congress' design to rely on the Telecommunications Act and the Sherman Act enforced independently is revealed in two ways. First, the Telecommunications Act stated explicitly that even though antitrust laws would remain applicable, the Telecommunications Act was not altering preexisting antitrust laws. *See* § 601(b)(1), 110 Stat. at 143 ("[N]othing in this Act . . . shall be construed to *modify*, impair, or supersede the applicability of any of the antitrust laws") (emphasis added). This may be understood to mean that just as Congress did not intend that the Telecommunications Act would immunize conduct illegal under the antitrust laws, it also did not intend to have the duties imposed by the Telecommunications Act modify or expand the scope of the Sherman Act. Legislative history confirms this concept that the Telecommunications Act was intended to preserve the role of the antitrust laws as they stood at the time of the 1996 Act's enactment. *See, e.g.*, 142 Cong. Rec. S687 (daily ed. Feb. 1, 1996) (statement of Sen. Pressler) ("This bill does not affect our antitrust laws. The antitrust laws stay in place"); 141 Cong. Rec. S8154 (daily ed. June 12, 1995) (statement of Sen. Hollings) ("Section 2 of the Sherman Antitrust Act is untouched, absolutely untouched"); 141 Cong. Rec. S8152 (daily ed. June 12, 1995) (statement of Sen. Breaux) ("No one can say that this bill somehow guts

19

the Department of Justice's role in enforcing antitrust laws, because it makes no changes in that"). Thus, it appears that Congress wished to have both acts further competition in local telecommunications services markets through *independent* means. Stated otherwise, Congress intended that even as it imposed new duties through enactment of the Telecommunications Act that would fall outside the parameters of the antitrust laws, it intended that the duties imposed by the antitrust laws would be left "untouched."

Second, the procedures and remedies used to enforce each law are distinct. The Telecommunications Act provides for State regulatory commission approval of interconnection agreements and ongoing supervision of the obligations imposed by the agreements. *See Bell Atlantic Md.*, 240 F.3d at 299-301. If Congress did not intend to rely on those procedures independently, it would not have inserted the entirely new scheme of §§ 251 and 252. It would have simply relied on the antitrust laws' enforcement in federal district courts under the Clayton Act, which authorizes treble damages and attorneys fees to private litigants. *See* 15 U.S.C. § 15. Instead, in enacting the Telecommunications Act, Congress was imposing new duties precisely focused to break up local monopolies, and its selection of duties, coupled with the remedial procedures of the Telecommunications Act, was to be in addition to duties imposed and remedies afforded by the Sherman Act. *See Goldwasser*, 222 F.3d at 400 ("The 1996 Act in fact has an elaborate enforcement structure that Congress created for purposes of managing the transition from the former regulated world to the hoped-for competitive markets of the future").

We must remain clear, however, that even as we conclude that the Telecommunications Act and the Sherman Act impose independently enforceable duties, we do not conclude that every complaint that states violations of §§ 251 and 252 of the Telecommunications Act cannot for that reason alone also state a claim for violations of the Sherman Act. In circumstances where facts state a claim under both statutes construed independently of each other, they may give rise to relief under each act.

Moreover, our rationale should not be taken so broadly as to preclude a monopolization claim built on conduct made illegal by statutes other than the Telecommunications Act. Rather, we conclude

20

only that a natural monopolist's legal refusal to deal is not made an illegal refusal to deal under the antitrust laws when Congress requires the monopolist to deal with competitors through duties imposed by the Telecommunications Act. The special relationship between the Telecommunications Act and the antitrust laws, acting in parallel but through distinct schemes to promote the general goal of competition, supports this conclusion.

Were we to conclude otherwise, every violation of§§ 251 and 252 of the Telecommunications Act could be asserted as a violation of the Sherman Act merely by alleging that the conduct was undertaken with an intent to monopolize, and the intent element would be supplied by noting that the defendant simply resisted compliance with the Telecommunications Act, which is aimed at breaking up monopolies. In such a case, the procedures and remedies specified by Congress for violations of the Telecommunications Act would become subservient to, indeed overrun by, the Sherman Act. This result would be directly contrary to Congress' choice of furthering competition through newly crafted affirmative duties and procedures, which were in addition to and beyond the duties imposed under § 2 of the Sherman Act. Enforcement under the Sherman Act would effectively collapse enforcement of the Telecommunications Act, leaving only one effective means — the treble-damages suit.

For all of these reasons, we conclude that the Sherman Act continues to apply in its own traditional domain, applying as it did before the Telecommunications Act, and the Telecommunications Act imposes new duties that may be enforced in accordance with its own provisions but not under the Sherman Act unless the conduct otherwise would have supported a claim under the Sherman Act absent the authority of the Telecommunications Act. *See Goldwasser*, 222 F.3d at 401. *But see Trinko*, 305 F.3d at 107-13 (permitting antitrust claims to proceed by applying general antitrust principles); *Covad*, 299 F.3d at 1285-92 (same).

Thus, when we focus on the conduct alleged by Cavalier in the complaint before us to determine whether it amounts to breaches of duties imposed for the first time and only by the Telecommunications Act, we conclude that the conduct alleged would not, independent of the Telecommunications Act, violate duties imposed under the Sher-

21

man Act. When Virginia lifted its ban on competition in the local tele-communications industry, Verizon would not have been obligated to rent its facilities and provide access to its elements to competitors to enable them to enter the market, and a complaint that alleges that it had a duty to do so under the antitrust laws would fail to state a claim upon which relief could be granted. Although the Telecommunications Act did impose these obligations on Verizon, Cavalier's recourse is to the procedures and remedies afforded by the Telecommunications Act, not to those afforded by the antitrust laws.

Because we find that Cavalier's complaint alleges only breaches of duties that did not exist prior to the enactment of the Telecommunications Act and would not have supported a claim of monopolization or attempted monopolization, it has failed to state a claim under § 2 of the Sherman Act, and the State analogue, upon which relief can be granted. We therefore hold that the district court properly granted Verizon's motion to dismiss this action pursuant to Rule 12(b)(6), and we affirm the judgment of the district court.

*AFFIRMED*

GREENBERG, Senior Circuit Judge, dissenting:

As I would find that Cavalier's complaint adequately states a claim for relief under the essential facilities doctrine, I respectfully dissent.

As a preliminary matter, I point out that I agree wholeheartedly with the majority's analysis of the relationship between the Sherman Act and the Telecommunications Act. In particular, I support its conclusion that "the provisions of the Telecommunications Act do not limit the applicability of the antitrust laws to Verizon." Maj. Op. at 17. Furthermore, I agree both that "the special, indeed idiosyncratic, relationship between the Telecommunications Act and the Sherman Act prevents the Sherman Act from taking on the role of enforcing duties imposed for the first time by the Telecommunications Act," *id.* at 19, and that "[i]n circumstances where facts state a claim under both statutes construed independently of each other, they may give rise to the relief under each act," *id.* at 20.

22

I differ with the majority, therefore, only with regard to my understanding of how a complaint alleging violations of the Sherman Act under an essential facilities theory should be dealt with on a motion under Fed. R. Civ. P. 12(b)(6). I cannot agree with the assertion that "*[a]ll* of the untoward conduct attributed to Verizon in the complaint arises from duties imposed on Verizon by the Telecommunications Act." *Id.* at 12 (emphasis in original); *see also id.* at 17 ("[W]e must still determine whether *violations of §§ 251 and 252 of the Telecommunications Act as alleged in the complaint before us* support a claim under the antitrust laws.") (emphasis added). In my view, this reading of the complaint is too narrow given that a complaint should not be dismissed under Rule 12(b)(6) unless it appears certain that the plaintiff can prove no set of facts which would support its claim and entitle it to relief. *See, e.g.*, *Franks v. Ross*, 313 F.3d 184, 192 (4th Cir. 2002).

The essential facilities doctrine is a narrow exception to the rule that a monopolist has no duty to deal with its competitors. *See Covad Communications Corp. v. Bell Atlantic Corp.*, 201 F. Supp. 2d 123, 131 (D.D.C. 2002) (citing *Olympia Equip. Leasing Co. v. W. Union Telegraph Co.*, 797 F.2d 370, 376 (7th Cir. 1986)). Although the doctrine certainly has its critics, *see, e.g.*, 3A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 771c (2d ed. 2002), there is no denying that it "has a long and respected history as part of U.S. antitrust law," Robert Pitofsky et al., *The Essential Facilities Doctrine Under U.S. Antitrust Law*, 70 Antitrust L.J. 443, 445 (2002). To state an essential facilities claim, a plaintiff must allege: (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility. *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 150-51 (4th Cir. 1990) (citing *MCI Communications Corp. v. Am. Tel. & Telegraph Co.*, 709 F.2d 1081, 1132-33 (7th Cir. 1983)). As the Court of Appeals for the Eleventh Circuit summarized the doctrine, "[t]he `applicable legal standard' is that `[a]ny company which controls an `essential facility' or a `strategic bottleneck' in the market violates the antitrust laws if it fails to make access to that facility available to its competitors *on fair and reasonable terms* that do not disadvantage them.'" *Covad Communications Co. v. BellSouth Corp.*, 299 F.3d 1272, 1287 (11th Cir. 2002) (quoting *United States*

23

*v. AT&T*, 524 F. Supp. 1336, 1352-53 (D.D.C. 1981) (emphasis and second alteration in *Covad*)). This standard is necessarily factbound, and cases dismissing essential facilities claims accordingly have been more common in motions for summary judgment contexts rather than in motions to dismiss contexts. *See id.* at 1287 n.13 (citing summary judgment cases); *see also Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 924 F.2d 539, 545 (4th Cir. 1991) (affirming summary judgment for defendant); Pitofsky et al., *supra*, at 450 ("Given the stringency of the widely-adopted requirements set forth in *MCI Communications*, U.S. courts rarely find liability under the essential facilities doctrine. But even courts rejecting application of the doctrine note that their analysis is highly fact-specific . . . .").

I believe that the complaint alleges facts that, when all inferences are drawn in favor of Cavalier, state a viable claim of monopolization under the essential facilities doctrine. In particular, I would follow the lead of the Courts of Appeals for the Second and Eleventh Circuits, which have held that essential facilities claims similar to those here should survive a motion to dismiss. In so holding, the Court of Appeals for the Second Circuit stated:

> [T]he amended complaint may state a claim under the "essential facilities" doctrine. The plaintiff alleges that access to the local loop is essential to competing in the local phone service market, and that creating independent facilities would be prohibitively expensive. The defendant allegedly has failed to provide its competitor . . . reasonable access to these facilities. . . . Although the defendant may ultimately be able to show that the local loop is not an essential facility, or that it provided the plaintiff with reasonable access to the local loop, these are issues that the district court should consider in the first instance.

*Law Offices of Curtis V. Trinko, LLP v. Bell Atlantic Corp.*, 305 F.3d 89, 108 (2d Cir. 2002) (emphasis omitted), *cert. granted*, 123 S.Ct. 1480 (Mar. 10, 2003) (No. 02-682). The separate opinion in *Trinko* specifically emphasized "the extent to which . . . the procedural posture of the case may influence the outcome of this appeal." *Trinko*, 309 F.3d 71, 72 (2d Cir. 2002) (Sack, J., concurring in part and dissenting in part). The Court of Appeals for the Eleventh Circuit was

24

even more explicit in rejecting an incumbent local exchange carrier's ("ILEC") factbound arguments for dismissal; indeed, it rejected arguments by the ILEC parallel to those advanced by Verizon here, noting that "these are arguments that must be addressed at a later stage of the proceedings, such as summary judgment or trial." *Covad*, 299 F.3d at 1286.[1] I believe that, in holding that the conduct alleged does not violate duties imposed under the Sherman Act, independent of those under the Telecommunications Act, because Verizon has no antitrust duty to rent facilities to its competitors, the majority has resolved questions of fact adversely to Cavalier. In particular, the majority's implicit holding is that because Verizon traditionally has been in the business of providing telecommunications services to consumers and not of renting facilities to competitors, it would have to alter the nature of its business to make its essential facilities available to Cavalier and that any degree of transformation of one's business is per se not feasible under the fourth prong of the *MCI* test.

I note that this is not a case like that posited in Verizon's brief, *see* Br. of Appellee at 32, or the identical argument made by BellSouth (and rejected by the court) in *Covad*, *see Covad*, 299 F.3d at 1286, however, where a competitor seeks to require the monopolist to "build new capacity to satisfy a would-be sharer," 3A Areeda & Hovenkamp, Antitrust Law ¶ 773e, at 210. In such a case, I would, perhaps, be more willing to say that, as a matter of law, providing access to the essential facility would not be feasible. Here, however, Cavalier alleges that Verizon refused to provide Cavalier *access to existing essential facilities*, namely, "last-mile" facilities like the local loop connecting individual homes and businesses to Verizon's central office, when it could have done so. Compl. at ¶¶ 21, 92, 93. Constru-

---

[1] The ILEC in *Covad* advanced three main arguments: (1) that the competing local exchange carrier ("CLEC") complained only about the terms or quality of access, but did not allege an actual denial of access to the essential facility; (2) that the CLEC sought "preferential access" to the local loop, which would require the ILEC to "abandon its facilities"; and (3) that the CLEC was attempting to force the ILEC to construct new facilities or alter the nature of its business and become a renter of facilities. *Covad*, 299 F.3d at 1286. Verizon makes precisely these same three arguments in this case, and the majority accepts the third as a basis for affirming the dismissal. Maj. Op. at 15.

25

ing these allegations liberally in favor of Cavalier, we should assume that Verizon need do little more than sign leasing agreements covering those last-mile facilities implicated when Cavalier woos a new customer. If more burdensome steps are required, Verizon should proffer evidence to that effect, but it should do so as an aspect of the development of a factual record. Furthermore, Cavalier alleges that, where access to those facilities nominally was granted, Verizon intentionally provided the access in a discriminatory way, for example, by providing a disproportionate number of nonfunctioning last-mile facilities to Cavalier customers, resulting in service interruptions that damaged Cavalier. *Id.* at ¶¶ 102-05. It alleges that Verizon knowingly took all of these steps with the intent to maintain its monopoly. Cavalier therefore has alleged a relatively straightforward violation of the essential facilities doctrine. It does not seek preferential access or ask that Verizon build new capacity, but rather asks that Verizon make available on reasonable terms the facilities Cavalier requires to be able to compete.

Admittedly, by reason of the historical fortuity that it until recently enjoyed a state-sponsored monopoly in the local services market, Verizon and its predecessors never have had occasion to get into the business of leasing access to such facilities.[2] In the majority's view, this point is conclusive. Under my understanding of the essential facilities doctrine, this fact is just one factor to consider in determining whether Verizon feasibly could have provided such access. Verizon very well may prove that it could not feasibly have provided the access sought by Cavalier without truly altering the nature of its business. *Cf. Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 992-93 (D.C. Cir. 1977) ("[The essential facilities doctrine] must be carefully delimited: the antitrust laws do not require that an essential facility be shared if such sharing would be impractical or would inhibit the defendant's ability to serve its customers adequately."). On the other hand, Cavalier may be able to show that, although Verizon has not

---

[2] I note that this "fact" has been discussed in the parties' briefs and effectively has been judicially noticed by the majority, despite the fact that it is not a part of the complaint or any other part of the record. That some evidence should be introduced to support the proposition that Verizon has never leased such facilities, at least since 1996, further justifies letting this case go forward so that a factual record may be developed.

been in the habit of leasing access to such facilities, the burden on Verizon of doing so would be so slight that it could not be said to be transforming its business by making those facilities available. In other words, Cavalier may be able to prove that Verizon failed to make last-mile facilities available to it on fair and reasonable terms even though doing so would have been perfectly feasible and would not have required Verizon to alter the nature of its business in any meaningful way.

Although competition now has replaced sanctioned monopoly in the industry, Verizon continues to have exclusive control of a facility crucial to such competition and, taking Cavalier's allegations as true and drawing all inferences in its favor, refuses to make those facilities available on fair and reasonable terms even though doing so would not be burdensome and would not require Verizon to transform its existing business in any meaningful way. I find no support in the caselaw for the conclusion that Cavalier could prove no set of facts consistent with its complaint to demonstrate that Verizon unreasonably denied access to such facilities where it feasibly could have provided it, even if Verizon never has leased such facilities in the past. Indeed, one of the leading essential facilities cases upheld a jury finding that AT&T, which was also, of course, in the business of providing telecommunications services, not of leasing facilities, denied MCI access to essential facilities (in fact, at least in part the same type of essential facilities involved here, namely the interconnections between customers' residences and the monopolist's central facilities) where such access reasonably could have been provided. *MCI*, 708 F.2d at 1131-33. More importantly, when this court has held that an essential facilities claim could not succeed because providing access to the essential facility would have required the monopolist to alter its business, it has done so on summary judgment proceedings, after development of a factual record, considering the history of the business as part of the feasibility element. *See, e.g.*, *Laurel Sand*, 924 F.2d at 545.

For these reasons, even though I largely agree with the majority opinion, I respectfully dissent as I would reverse the district court's judgment and remand this case to that court for further proceedings.

27